## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1) BRADLEY SCHLOTTMAN,** | ) | |
| **(2) JONATHAN SCHLOTTMAN,** | ) | |
| **(3) JOSEPH MCMUNN** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. CIV-08-1275C** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **(1) UNIT DRILLING COMPANY,** | ) | |
| **LLC,** | ) | |
| **(2) SHANE BATTLES, an individual,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## AND BRIEF IN SUPPORT

Pursuant to FED. R. CIV. P. 56 and LCvR 56.1, Defendants, Unit Drilling Company ("Unit") and Shane Battles ("Battles"), respectfully move for summary judgment against Plaintiffs, Bradley Schlottman ("Brad"), Jonathan ("Jonathan" ) and Joseph McMunn ("McMunn"), collectively referred to as Plaintiffs. The undisputed facts demonstrate Plaintiffs' claims lack merit and that Defendants are entitled to judgment as a matter of law on those claims.

## I. INTRODUCTION

Unit is an Oklahoma corporation which provides contract drilling services to oil and gas exploration companies. Brad and Jonathan are brothers, and McMunn is their half-brother.[1] All three are Caucasian. Jonathan, Brad and McMunn allege that they were subjected to sexual and racial harassment in violation of Title VII of the 1964 Civil

---

[1] McMunn testified that he, Brad and Jonathan have the same biological mother.

Rights Act, retaliation under Title VII.

This Motion seeks dismissal of Plaintiffs' claims, and to cut-off Plaintiffs' claims for back pay damages, if any, for their failure to maintain comparable employment. The undisputed facts demonstrate the Plaintiffs do not have a cognizable claim of actionable racial or same-sex harassment under Title VII. It is further undisputed that Plaintiffs obtained comparable or better employment on the date they voluntarily quit their employment with Unit; that Brad and McMunn lost their jobs when they voluntarily quit, and that Jonathan lost that job when he was fired. Therefore, Plaintiffs' claims for back pay damages should be dismissed as a matter of law.

All three Plaintiffs claim they were subject to a hostile work environment due to alleged sexual harassment by Battles. Plaintiffs, however, cannot establish the conduct about which they complain was subjectively offensive. Indeed, as the above undisputed material fact under this proposition reveal, *after* the alleged conduct occurred, the Schlottman brothers recruited their younger brother McMunn to come to work at Unit; helped him get a job at Unit; ensured he got a job on the same rig; and McMunn did so willingly, coming to work on his 18th birthday - the first day he was no longer prohibited under child labor laws. Summary judgment is proper.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to LCvR 56.1(b), Defendants submit the following concise statement of undisputed material facts which establishes that no genuine issue exists to support Plaintiffs' claims, and shows that Defendants are entitled to judgment as a matter of law:

### A.    PLAINTIFFS' EMPLOYMENT HISTORY WITH UNIT.

1.      Unit is in the business of operating drilling rigs in the oil and gas industry. Each of the Plaintiffs worked as hourly employees for Unit on Rig 150.  *See* Second Amended Complaint (Dkt. No. 55), ¶ 8.

2.      Jonathan worked for Unit on two separate occasions.  Jonathan first worked for Unit from February 1, 2007, until October 31, 2007, when he was fired for failing to report to work.  *See* Ex. 5, Field Payroll Employee Status Change Separation Notice 10/31/07; Ex. 1, Deposition of Jonathan Schlottman ("J. Schlottman Depo."), Vol. I, pp. 90-91, 131.

3.      Brad's employment with Unit and Jonathan's second employment at Unit began on November 20, 2007.  *See* Ex. 3, Deposition of Bradley Schlottman (B. Schlottman Depo.), p. 58; Ex. 1, J. Schlottman Depo., Vol. I, p. 45.

4.      A little more than three (3) months after they began working for Unit on Rig 150, Jonathan and Brad successfully encouraged their younger brother, McMunn, to apply for a job with Unit on Rig 150.  *See* Ex. 1, J. Schlottman, Depo, Vol. I, p. 278; Ex. 3, B. Schlottman Depo., p. 293.

5.      McMunn followed the recommendation of his older brothers by applying for a position with Unit on Rig 150, and, indeed, was hired by Unit on February 29, 2008, and assigned to Rig 150.  *See* Ex. 4, Deposition of Joseph McMunn ("J. McMunn Depo."), p. 126.

6.      On April 22, 2008, Plaintiffs' employment with Unit ended when all three failed to report to work.  *See* Ex. 6, Employee Status Change Notice-Jonathan

Schlottman; Ex. 7, Employee Status Change Notice-Brad Schlottman; Ex. 8, Employee Status Change Notice-Joseph McMunn.

7.      At the time Plaintiffs abandoned their jobs with Unit, Jonathan, Brad and McMunn were all being paid $19.30 per hour.  *See* Ex. 9, List Check Analysis-Jonathan Schlottman; Ex. 10, List Check Analysis-Bradley Schlottman; Ex. 11, List Check Analysis-Joseph McMunn; Exhibit 1, J. Schlottman Depo., Vol. I, p. 50, 85; Dkt # 55, Second Amended Complaint, ¶¶ 5, 6; Ex. 3, B. Schlottman Depo., 57-59, 101, and 124; Ex. 4, McMunn Depo., ¶ 106.

### B.      PLAINTIFFS' POST-UNIT EMPLOYMENT.

### Nabors Drilling

8.      Prior to leaving employment with Unit on April 22, 2008, all three Plaintiffs applied for and obtained employment with Nabors Drilling working on a drilling rig. Jonathan admitted that he lied on his employment application with Nabors in several respects, including his employment history and educational background.  *See* Ex. 1, Jonathan Schlottman Depo., Vol. I, pp. 86-88, 132-133; Ex. 18, J. Schlottman Nabors Application.

9.      Brad admits he knowingly lied on his employment application with Nabors in several respects regarding his employment history. *See* Ex. 3, B. Schlottman Depo., p. 97; Ex. 19, B. Schlottman Nabors Application.

9.      Jonathan's starting pay with Nabors was $28 per hour, **$7.70 more** per hour than his hourly pay with Unit.  Brad's starting pay with Nabors was $26.50 per hour, **$7.20 more** per hour than his hourly pay with Unit.  McMunn's beginning training wage

with Nabors was $14.00 per hour, but was raised and nearly doubled less than a month later to $26.00 per hour, a **$6.70 per hour increase** above pay with Unit.  *See* Ex. 12, J. Schlottman Nabors Corporate Services Pay Information; Ex. 13, B. Schlottman Nabors Corporate Services Pay Information; Ex. 14, J. McMunn Nabors Corporate Services Pay Information; Ex. 1, J. Schlottman Depo., Vol. I, pp. 48-49, 91, 125-126; Ex. 3, B. Schlottman Depo., 66, 82-86, 101, 120, 124; Ex. 4, McMunn Depo., pp. 118-119.

10.     On July 1, 2008, less than three months into their new jobs with Nabors, **Jonathan was fired** for a safety violation after he **"rode [the] cablehook of [the] skycrane down off [the] derrick, [then] argued [with] and cursed at the Rig Manager, then left [the] rig."** *See* Ex. 15, J. Schlottman Nabors Drilling Change of Status.  *See also* Ex. 1, J. Schlottman Depo. I at 95-98, 111.

11.     The same day Jonathan was fired by Nabors, **Brad and McMunn abandoned their jobs**.  *See* Ex. 16, B. Schlottman Nabors Drilling Change of Status; Ex. 17, J. McMunn Nabors Drilling Change of Status.  *See also*, Ex. 4, McMunn Depo., p. 119.

12.     McMunn admits that after he abandoned his job at Nabors, he has failed to seek employment comparable to his position at Unit.  *See* Ex. 4, McMunn Depo. at 84, 286-287; Ex. 1, Jonathan Schlottman Depo. Vol. I, pp. 109, 112.

**NOMAC Drilling**

13.     After being fired and abandoning their jobs at Nabors, Jonathan and Brad obtained employment working on a drilling rig for NOMAC Drilling Corporation on August 3, 2008.

-5-

14.   Jonathan admits he knowingly lied on his employment application with NOMAC in several respects, including his employment history and educational background. *See* Ex. 1, J. Schlottman Depo., Vol. I, pp. 122-127, 129-131, 133; Ex. 24, J. Schlottman NOMAC Application.

15.   Brad admits he also knowingly lied on his employment application with NOMAC in several respects regarding his employment history. *See* Ex. 3, Bradley Schlottman Depo., pp. 120, 123; Ex. 25, B. Schlottman NOMAC Application.

16.   Jonathan's starting pay with NOMAC was $23 per hour, which is $2.70 more per hour than his hourly pay with Unit.  Brad's starting pay with NOMAC was $20.25 per hour, which is $0.95 more per hour than his hourly pay with Unit. *See* Ex. 20, NOMAC Drilling Payroll Register-J. Schlottman; Ex. 21, NOMAC Drilling Payroll Register-B. Schlottman. *See also* Ex. 1, J. Schlottman Depo. I at 51, 154-155.

17.   On August 15, 2008, **Jonathan was fired** from NOMAC.  The very same day, **Brad voluntarily quit** his employment with NOMAC. *See* Ex. 22, NOMAC Employment Termination Form-J. Schlottman; Ex. 23, NOMAC Employment Termination Form-B. Schlottman.  *See also* Ex. 1, J. Schlottman Depo. Vol. I at 134-135, 137-144, 192; Ex. 3, B. Schlottman Depo. at 132, 142-146, 181-182.

**Cactus Drilling**

18.   On August 27, 2008, Jonathan and Brad obtained jobs working on a drilling rig for Cactus Drilling Company ("Cactus").  Jonathan's starting pay with Cactus was $21.05 per hour, which is $1.75 more per hour than his hourly pay with Unit.  Brad's starting pay with Cactus was $19.00 per hour, comparable to his hourly pay with Unit.

*See* Ex. 26, Cactus Detail Payroll Register-J. Schlottman; Ex. 27, Cactus Detail Payroll Register-B. Schlottman; Ex 1, J. Schlottman Depo. I at 52, 155; Ex. 2, J. Schlottman Depo Vol. II, p. 569.

20.     Jonathan admits he knowingly lied on his employment application with Cactus in several respects, including his employment history and educational background. *See* Ex. 1, J. Schlottman Depo., Vol. I, pp. 133, 158-160; Ex. 30, J. Schlottman Cactus Application.

20.     Brad admits he also knowingly lied on his employment application with Cactus in several respects regarding his employment history. *See* Ex. 3, B. Schlottman Depo., pp. 157-158, 160-161; Ex. 31, B. Schlottman Cactus Application.

21.     Less than two months later, on October 16, 2008, Jonathan and Brad were **both fired from Cactus** for "no call, no show." *See* Ex. 28, Cactus Employee Separation Report-J. Schlottman; Ex. 29, Cactus Employee Separation Report-B. Schlottman; Ex. 3, B. Schlottman Depo. at 76-77, 148, 150-152, 164-167; Ex. 1, J. Schlottman's Depo. I at 181-182, 194.

**Patterson-UTI**

22.     On October 16, 2008, the same day they were terminated by Cactus for abandoning their jobs, Jonathan and Brad obtained employment working on a drilling rig for Patterson-UTI ("Patterson").   Jonathan's starting pay at Patterson was $19.00 per hour, comparable to his hourly pay at Unit.   Brad's starting pay with Patterson was $21.25 per hour, more per hour than his hourly pay at Unit. *See* Ex. 32, Patterson Payroll Register-J. Schlottman; Ex. 33, Patterson Payroll Register-B. Schlottman; Ex. 1, J.

Schlottman Depo. Vol. I at 54, 69-70, 190; Ex. 3, B. Schlottman Depo. at 69, 146-148, 181-182.

23.     Jonathan admits he knowingly lied on his employment application with Patterson in several respects, including his employment history and educational background. *See* Ex. 1, J. Schlottman Depo., Vol. I, pp. 133,. 199; Ex. 36, J. Schlottman Patterson Application.

24.     Brad admits he also lied on his employment application with Patterson in several respects regarding his employment history. *See* Ex. 3, Bradley Schlottman Depo., pp. 173-174, 176; Ex. 37, B. Schlottman Patterson Application.

25.     On November 12, 2008, Brad was fired from Patterson for talking back to his supervisor.  That same day, Jonathan voluntarily quit his employment with Patterson. *See* Ex. 34, Patterson Separation Notice-B. Schlottman, Ex. 3, B. Schlottman Depo., pp. 100, 119, 167, 180; Ex. 1, J. Schlottman Depo. I, pp. 128, 190-192, 203-204; Ex. 35, Patterson Separation Notice-J. Schlottman.

**Pioneer Drilling**

26.     On November 17, 2008, Jonathan and Brad were hired to work on a drilling rig for Pioneer Drilling ("Pioneer").  Jonathan's starting pay at Pioneer was $31.25 per hour, substantially more than his hourly pay with Unit.  Brad's starting pay with Pioneer was $29.75 per hour, which was also substantially more than his hourly pay with Unit. *See* Ex. 38, Pioneer Payroll Data-B. Schlottman; Ex. 39-Pioneer Payroll Data-J. Schlottman.

27.     Consistent with his applications with the above former employers, Jonathan admits he lied on his employment application with Pioneer in several respects, including his employment history and educational background.  Ex. 1, J. Schlottman Depo., Vol. I, pp. 133, 210; and Ex. 42, J. Schlottman Pioneer Application.

28.     Brad admits he also lied on his application with Pioneer in several respects regarding his employment history. Ex. 3, B. Schlottman Depo., pp. 186, 188; Ex. 43, B. Schlottman Pioneer Application.

29.     On January 17, 2009, Brad and Jonathan voluntarily quit their jobs with Pioneer. Ex. 40, Pioneer Termination Report-B. Schlottman; Ex. 41, Pioneer Termination Report-J. Schlottman.

30.     Jonathan and Brad primarily worked for the same drilling companies at the same time from the day Brad was first hired by Unit until both were working for Helmerich & Payne in 2009.  Jonathan and Brad admit they have an agreement that if one was fired by their employer, the other brother would quit working for the same employer. Ex. 1, J. Schlottman Depo. I at 112, 115, 174-175, 190; and, Ex. 3, B. Schlottman Depo. at page 80-82.

## C.     ALLEGATIONS OF DISCRIMINATION AND HARASSMENT BASED ON RACE

## McMunn

31.     McMunn admits the only instance of perceived racial discrimination he witnessed was when Carl Powell, an African-American male, referred to him as "white trash" on one occasion.  *See* Ex. 4, J. McMunn Depo. at 155-156, 266, 300; Dkt # 55, Second Amended Complaint at ¶ 9.

31.     McMunn reported the remark to a supervisor, Battles, who said he would talk to Powell.  McMunn admits that after he spoke with Battles, Powell never again made race-related comments.  McMunn concedes his claims for race discrimination, harassment or retaliation should be dismissed. *See* Ex. 4, J. McMunn Depo. at 158-160, 261-262.

**Brad Schlottman**

32.     Brad testified that he perceived racial discrimination or harassment in the form of two (2) isolated comments made by Powell.  First, during an argument between Powell and another employee, Jonathan Moore, Brad claims he heard Powell say that Powell and others could take care of "white people" like Moore, Brad and Jonathan.  The second comment was when Powell made a reference to Brad being a member of the Ku Klux Klan or Aryan Brotherhood, based upon Brad's appearance, attire or haircut.  Brad admits Powell never verbally threatened him or his job, and that Powell never treated Brad differently than any other employees due to Brad's race.  Ex. 3, B. Schlottman Depo. at 350-353, 358-368, 372, 396-405, 411-412.

33.     Brad admits he does not recall ever reporting either of the two (2) comments to any supervisor or member of Unit management. Ex. 3, B. Schlottman Depo. at  366-367, 372, 404, 411-412.

**Jonathan Schlottman**

34.     Jonathan admits he got along with Powell when they started working together, and that Powell's reference to Jonathan as a "white boy" did not offend him.

Jonathan testified that Powell never threatened him with bodily harm. Ex. 1, J. Schlottman Depo. I at 312-313; Ex. 2, J. Schlottman Depo. Vol. II, p. 482.

35.     Jonathan states that the first instance of perceived objectionable race-based discrimination or conduct he witnessed was when Powell got into a dispute with another employee, Randall Moore, a Caucasian male.  Jonathan says Moore and Powell shoved and yelled at each other, and that Moore or his brother, Jonathan Moore, who was also on the crew, "spouted off something" to the effect that the Moores and their dad were part of a biker gang and implied the gang was part of the Aryan Brotherhood.  Moore stated that "they supported one hundred percent the Aryan Brotherhood" and that if Powell "wants to get stupid" they could "deal with him" because "they deal with people like him all the time."  After this altercation, Jonathan says Powell and the Moore brothers used racial epithets toward each other.  Ex. 1, J. Schlottman Depo. I at 312-327.

36.     After the Moore altercation and threats against Powell by at least one of the Moore brothers, Jonathan says Powell referred to other white members of the crew as being part of the Aryan Brotherhood, and that Powell could get more work done if he had Mexicans on his crew. Ex. 1, J. Schlottman Depo. I at 312-318.

37.     Jonathan says he asked Powell to stop referring to him as a member of the Aryan Brotherhood on one (1) occasion, and reported it to Battles.  Jonathan says Battles held a meeting with Jonathan and Powell to resolve the issue.  At the meeting, Jonathan testified that Powell indicated he was only kidding and did not mean to be derogatory toward him or any other worker.  Later, when Powell made the comment again, Jonathan

told Battles who, in-turn, spoke to Powell. Ex. 1, J. Schlottman Depo. Vol. I at 318-319; Ex. 2, J. Schlottman Depo. Vol. II, p. 448.

### D.   ALLEGED SAME-SEX HARASSMENT.

38.     Jonathan and Brad claim they were subjected to same-sex harassment from Battles before their younger brother, McMunn came to work for Unit in February 2008. Ex. 3, B. Schlottman Depo, p. 311, ll. 8-12, p. 314. ll. 14-16.

39.     McMunn testified Brad and Jonathan would never intentionally put him in harm's way. Ex. 4, McMunn Depo., p. 187, ll. 2-4.

40.     Jonathan and Brad encouraged McMunn to obtain a job with Unit on Rig 150. Ex. 4, McMunn Depo., p. 186, ll. 12-14.

41.     Jonathan and Brad helped McMunn get a job with Unit on Rig 150.  Ex. 1, J. Schlottman Depo, p. 278, ll. 4-17; and, Ex 3, B. Schlottman, p. 293, ll. 1-4, and pp. 296-296.

42.     McMunn turned 18 years old on February 27, 2008.  Ex. 4, J. McMunn Depo., p. 4.

43.     On his 18th birthday, the first full day after McMunn was no longer prohibited by child labor laws to work on a drilling rig because of age, he applied for employment with Unit with the intent of going to work on Rig 150 with his older brothers, Jonathan and Brad.  Ex. 4, McMunn Depo., pp. 72-73.

44.     McMunn was assigned to Rig 150, but did not work on the same crew or shift with Brad and John. Ex. 1, J. Schlottman Depo., p. 280, ll. 13-15.

### E.     RETALIATION

45.     McMunn admits Unit never retaliated against him for filing an EEOC charge because he never returned to work, and concedes any claim against Unit by him for retaliation should be dismissed (Ex. 4, McMunn Depo. at 252-254, 261, 336).

46.     Jonathan admits he has no evidence that Unit retaliated against him. Ex.2, Jonathan Schlottman Depo. Vol. II at 480-481.

47.     Brad was aware of Unit's anti-retaliation policy which prohibits employees from retaliating against other employees who report a complaint of discrimination or harassment. Ex. 3, Brad Schlottman Depo. at 324-325.

## III.  LEGAL STANDARDS GOVERNING SUMMARY JUDGMENT

A motion for summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is not genuine issue as to any material fact." FED. R. CIV. P. 56©.  Summary judgment procedure "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting FED.R.CIV.P. 1).

Summary judgment should be granted when no genuine issue of material fact exists, and the movant is entitled to judgment as a matter of law.  *Id.* at 322-23; *Kendall v. Watkins*, 998 F.2d 848, 850 (10th Cir. 1993).  "[The] opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving

party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted).

The mere existence of a "scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 259 (quotation and citation omitted). Rule 56© mandates judgment against a party who fails to adduce sufficient evidence of a triable dispute as to an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex*, 477 U.S. at 322. Rule 56© mandates judgment here, since Plaintiff cannot proffer evidence to show a triable dispute concerning all of the elements of her claims for relief.

## IV.  ARGUMENTS AND AUTHORITY

### A.  PLAINTIFFS' CLAIMS FOR RACE DISCRIMINATION MUST FAIL.

Plaintiffs assert discrimination, harassment and retaliation claims based on their race, Caucasian. However, as the undisputed evidence material facts and record evidence reveals, and as at least one Plaintiff admits, Plaintiffs' race-based claims are without merit.

McMunn testified that in two (2) isolated instances, an African-American, Carl Powell, referred to McMunn as "white trash." However, when McMunn reported the remarks to Defendant Battles, the comments ceased. *See* Undisputed Facts Nos. __.

Indeed, McMunn admits any claims he has for discrimination or harassment or retaliation based on race should be dismissed. *Id.*

Similarly, Brad can only identify two (2) race-related incidents he witnessed, both involving Powell.  First, during an apparent argument between Powell and another employee, Jonathan Moore, Brad claims he heard Powell say that Powell and others could take care of "white people" like Moore, Brad and Jonathan.  See Undisputed Material Fact No. 32. The second and last race-based incident identified by Brad was when Powell made a reference to Brad being a member of the Ku Klux Klan or Aryan Brotherhood, based upon Brad's appearance, attire or haircut. *Id.*  Despite these two (2) isolated comments, Brad admits Powell never verbally threatened him or his job, and that Powell never treated Brad differently than any other employees due to Brad's race. *Id.* Further, unlike his younger brother McMunn, who reported the only two (2) incidents McMunn can identify, Brad admits he never reported any race related incident. *See* Undisputed Facts No. 33

With respect to Jonathan Schlottman, he testified to have witnessed Powell in a dispute with another employee, Randall Moore, a Caucasian male. Undisputed Material Fact. No. 32.  Jonathan says the two men shoved and yelled at each other, and that Moore or his brother, Jonathan Moore, who was also on the crew, "spouted off something" to the effect that the Moores and their dad were part of a biker gang and implied the gang was part of the Aryan Brotherhood.  *Id.*  Jonathan testified that Moore told Powell that "they supported one hundred percent the Aryan Brotherhood" and that if Powell "wants to get stupid" they could "deal with him" because "they deal with people like him all the time."

*Id.* After this altercation, Jonathan says Powell and the Moore brothers used racial epithets toward each other.

In addition to witnessing a dispute between two or three other men, after the dispute and the threats made against Powell, Jonathan claims Powell referred to other white members of the crew as being part of the Aryan Brotherhood, and that Powell could get more work done if he had Mexicans on his crew. *See* Undisputed Material Fact. No. 36.  Jonathan says he asked Powell to stop referring to him as a member of the Aryan Brotherhood on one (1) occasion, and says he reported it to Battles.  Jonathan says Battles held a meeting with Jonathan and Powell to resolve the issue.  At the meeting, Jonathan testified that Powell indicated he was only kidding and did not mean to be derogatory toward him or any other worker.  Later, when Powell made the comment again, Jonathan told Battles who, in-turn, spoke to Powell. *Id.*

As established by Plaintiffs' own respective testimony, none of the Plaintiffs claim that Powell or Unit fired them or changed the terms of their employment or that they in any other way suffered an adverse employment action because of Plaintiffs' race. Consequently, Plaintiffs cannot make out a prima facie case of disparate treatment race discrimination. *Trujillo v. Univ. of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998).  Instead, their race claims hinge completely on the supposed hostile work environment they say was created by Powell's remarks, but those comments did not rise to the level of harassment required by law:

> To survive summary judgment on a racially hostile work environment claim, a plaintiff must show "that under the totality of the circumstances (1) the harassment was pervasive or severe enough

> to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus." *Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir. 1994)* (citation omitted). A plaintiff cannot meet this burden by demonstrating "a few isolated incidents of racial enmity" or "sporadic racial slurs." *Id.*, quoting *Hicks v. Gates Rubber Co., 833 F.2d 1406, 1412-13 (10th Cir. 1987)*. Instead, "there must be a steady barrage of opprobrious racial comments." *Id.*

*Chavez v. State of New Mexico*, 397 F.3d 826, 832 (10ᵗʰ Cir. 2005).[2]

As noted above, McMunn and Brad can only identify a few isolated instances of any race-related conduct, and, indeed, nothing which under any reasonable interpretation could be said to be so severe or pervasive that it altered the terms, conditions or privileges of their employment. This is especially true in light of the fact that the comments ceased when McMunn reported them to Battles, and Brad acknowledges he never even reported the two (2) stray remarks he identified. These remarks fall far short of the "steady barrage" necessary to make out a hostile environment claim. *Id.* Unit is clearly entitled to summary judgment on all race discrimination claims of McMunn and Brad Schlottman.

Although Jonathan Schlottman testified to more instances of racial comments than did his brothers, even his testimony falls fatally short of any cognizable claim under *Chavez*. Tellingly, Jonathan testified that he never heard Powell or anyone else make a race-related remark that Jonathan found offensive until one of the other crew members, Randall Moore, got into an altercation and later threatened Powell with retribution by the Aryan Brotherhood. In addition, the comment that Powell used most with regard to Jonathan, referring to him as a "white boy," did not offend Jonathan. Undisputed Fact

---

2 Because the elements of a hostile work environment claim are the same whether brought under Title VII or § 1981, *see Tademy v. Union Pac. Corp.*, 520 F.3d 1149, 1170 (10ᵗʰ Cir. 2008), so Plaintiffs' §1981 race claims are considered alongside their Title VII claims.

No. 34.

At best, the comments identified by Jonathan might be deemed to be "sporadic racial slurs," and there clearly was not "a steady barrage of opprobrious racial comments." *Chavez*, 397 F.3d at 832.   None of the Plaintiffs have sufficient facts to prove a case of racial discrimination or racial harassment under Title VII or § 1981, and Unit is entitled to judgment as a matter of law on all claims based on race discrimination or harassment.

### B.    PLAINTIFFS' CLAIMS FOR RETALIATION BY UNIT MUST FAIL.

Plaintiffs claims for retaliation under Title VII and § 1981 are unsupported by any evidence and must be discharged on summary judgment.

In order to prove a claim for retaliation, Plaintiffs must show that they suffered from an adverse employment decision and that the decision was causally connected to their assertion of a protected right under Title VII.  *Chavez v. Thomas & Betts Corp.*, 396 F.3d 1088, 1104 (10th Cir. 2005).  *See also Kindred v. State of Okahoma*, 2006 U.S.Dist. LEXIS 24117 (W.D.Okla. 2006) (quoting *Chavez*).

Applied here, none of the Plaintiffs testified that Unit ever retaliated against them. McMunn admits Unit never retaliated against him for filing an EEOC charge because he never returned to work after filing his charge, and, in fact, concedes any claim against Unit by him for retaliation should be dismissed. See Undisputed Material Fact No. 45. Jonathan also admits he has no evidence that Unit retaliated against him. *See* Undisputed Material Fact No. 46.  For his part, Brad admits he was aware of Unit's anti-retaliation policy which prohibits employees from retaliating against other employees who report a

complaint of discrimination or harassment, and he is unable to produce a *scintilla* of evidence to support a retaliation claim. See Undisputed Material Fact. No. 47.  Without any one of the Plaintiffs being able to identify or establish they suffered any adverse employment action, they have failed to meet one of the essential elements of a retaliation claim.  Consequently, Unit is entitled to judgment as a matter of law on all retaliation claims.

### C.   PLAINTIFFS' CLAIMS FOR BACK PAY MUST FAIL UNDER ALL THEORIES OF RECOVERY.

Plaintiffs have effectively destroyed their own claims to any entitlement of back-pay based upon their post-Unit pattern of obtaining high-paying jobs by lies and deceit, only to be followed by terminations for Tarzan-like shenanigans, insubordination, terminations and  job abandonment.

Title VII jurisprudence nullifies Plaintiffs' back pay claims under the circumstances of this case.  The U.S. Supreme Court set forth the standard for forfeiture of back pay awards to Title VII claimants in *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231-32, 102 S. Ct. 3057 (1982), as follows:

> An unemployed or underemployed claimant, like all other Title VII claimants, is subject to the <u>statutory duty to minimize damages</u> set out in § 706(g). This duty, rooted in an ancient principle of law, <u>requires the claimant to use reasonable diligence in finding other suitable employment</u>. Although the unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, <u>he forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied</u>.

(emphasis added) (footnotes omitted).  *See also Giandonato v. Syborn*, 804 F.2d 120, 123 (10th Cir. 1986) (quoting *Ford  Motor Co.*).

Various courts have pointed to *Ford Motor Co.* when finding that the obligation to search for equivalent employment includes the <u>obligation to "maintain" equivalent employment.</u>   Indeed, there is considerable authority "supporting the long-standing principle that a claimant who voluntarily quits comparable, interim employment fails to exercise reasonable diligence in the mitigation of damages "for purposes of tolling back pay."   *Brady v. Thurston Motor Lines*, 753 F.2d 1269, 1277-78 (4th Cir. 1985), citing *DiSalvo v. Chamber of Commerce*, 568 F.2d 593, 597-98 (8th Cir.  1978), and referring to *Stone v. D.A.& S. Oil Well Servicing Inc.*, 624 F.2d 142, 144 (10th Cir. 1980), and *Muller v. Untied States Steel Corp.*, 509 F.2d 923, 930 (10th Cir. 1975).   *See also Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160, 1168-69 (6th Cir. 1996) (if "<u>an employee suffers a 'willful loss of earnings,</u>' however, the employer's back pay liability is tolled.") (emphasis added).

Back pay is essentially designed as a "'make whole' remedy, returning the claimant to the financial position he would have been in had the unlawful discrimination not occurred."   *Brady*, 753 F.2d at 1278.   Because an employer should only be held responsible for losses suffered by the employee as a result of employment discrimination, the employer should not be accountable for losses willingly incurred by the claimant.   *Id*. To hold otherwise renders the back pay provision punitive and abuses the intent of that provision.   *Id*.

A court recently cited *Thurman* in holding that willful loss of earnings by quitting one's subsequent job tolls back pay due to the fact that the claimant's duty of reasonable diligence to locate other suitable employment also includes the duty to "maintain a

suitable job once it is located." *Richardson v. Tricom Pictures*, 334 F. Supp.2d 1303, 1310-11 (S.D.Fla. 2004). *See also, Baker v. John Morrell & Co.*, 263 F. Supp.2d 1161, 1179 (N.D. Iowa 2003) ("In general, a plaintiff fails to mitigate adequately and therefore is [not] entitled to … front pay 'to the extent he [or she] fails to remain in the labor market, fails to accept substantially similar employment, fails diligently to search for alternative work, or voluntarily quits alternative employment without good reason.'") Indeed, back pay is tolled when the voluntary quit "is motivated by personal reasons unrelated to the job or as a matter of personal convenience." *Brady*, 753 F. 2d at 1278. Thus, back pay is forfeited or tolled when an employee voluntarily quits alternative employment without good reason.

Additionally, back pay is forfeited when a claimant is involuntarily terminated from a comparable position due to intentional to violations of an employer's rules. *Brady*, 753 F.2d at 1278; *Richardson*, 334 F. Supp.2d at 1311. The reasonable diligence standard imposed on Title VII claimants "requires that in maintaining subsequent employment, a Title VII claimant act reasonably and responsibly in accordance with employer rules." *Brady*, 753 F.2d at 1277; *Richardson*, 334 F. Supp.2d at 1311 (quoting *Brady*). Thus, if any of the Plaintiffs were involuntarily terminated from their subsequent comparable positions due to intentional violation of the employer's rules, that individual Plaintiff's back pay is forfeited. Because all three Plaintiffs failed to uphold the reasonable diligence standard by either voluntarily quitting comparable employment without good reason or by being fired for misconduct, their claims for back pay should be forfeited.

The undisputed facts show that immediately upon quitting their employment with Unit, Plaintiffs took substantially higher paying jobs with Nabors Drilling. *See* Undisputed Facts No. 9. However, on July 1, 2008, less than three months into their new jobs, Jonathan Schlottman was fired for a safety violation after he **"rode [the] cablehook of [the] skycrane down off [the] derrick, [then] argued [with] and cursed at the Rig Manager, then left [the] rig."** *See* Undisputed Material Fact No. 10. The same day Jonathan performed his ill-conceived Tarzan act on the Nabors rig, his brothers walked off their jobs on the same rig out of a misplaced sense of loyalty. Undisputed Material Fact No. 11. Thereafter, McMunn admits he altogether has failed to seek any employment comparable to his position at Unit. Undisputed Material Fact No. 12.

Minus their younger brother, the Schlottmans continued to cut a path across the oil patch, from company to company, from terminations to job abandonment, lying to each employer along the way. Indeed, after being fired and abandoning their jobs at Nabors, Jonathan and Brad obtained employment working on a drilling rig for NOMAC Drilling Corporation on August 3, 2008, after each brother knowingly lied on their respective job applications. Undisputed Facts Nos. 14 and 15. Both were hired at pay rates higher than their hourly rate at Unit. Undidputed Fact. No. 16. Despite obtaining their higher paying jobs, Jonathan was fired from NOMAC in August 2008, which, as the established pattern would predict, led to Brad voluntarily quitting his job with NOMAC the same day. Undisputed Fact No. 17.

The pattern continued at Cactus. Both brothers completed lie-filled job applications and were hired by Cactus on August 27, 2008, in jobs which were better

paying and comparable to what they had with Unit.  Less than two months later, however, on October 16, 2008, the Schlottman brothers abandoned their jobs at Cactus. Undisputed Fact Nos. 18-21.

The Schlottmans abandoned their jobs at Cactus on the same day they were hired by Patterson.  This time it was Brad who was fired, on November 12, 2008, after he talked back to his supervisor.  And, Jonathan, predictably and voluntarily, then quit his job the same day. Undisputed Facts 22-24.  Five days later, the Schlottmans completed fabricated applications, Fact Nos. 27 and 28, and were hired by Pioneer Drilling at a very substantial pay increase from all of their previous jobs. Undisputed Fact. 26.  Those jobs were also short-lived.  On January 17, 2009, the Schlottmans quit. Undisputed Fact. 29.

The undisputed facts and evidence prove the Plaintiffs voluntarily quit higher paying jobs with subsequent employers without good reason.  And, the undisputed facts establish the Schlottmans were both been involuntarily terminated for violation of the workplace rules of numerous and various employers.   Plaintiffs are not entitled to back pay.

In addition, to the extent their state law *Burk* tort claims are based on the public policies set forth in Title VII so compensation for those claims will necessarily comport with the remedial scheme provided for Title VII claims.  *See Kruchowski v. The Weyerhaeuser Co.*, 2008 OK 105, ¶ 32 ("The *Burk* claims actionable character is anchored in the employer's discharge in breach of Oklahoma's public policy.  In order to assert such a claim, the plaintiff must show that a breach of Oklahoma's public policy occurred for which there is no statutorily-crafted remedy or the available statutory remedy

is not commensurate with that provided for similar work-related discrimination."). Because a statutory scheme, Title VII, is in place which provides greater remedies than Oklahoma's statutory remedies, Plaintiffs can seek, as *Burk* damages, the remedies afforded by Title VII, and Plaintiffs are limited thereby as shown above. Therefore, Plaintiffs are not entitled to back pay *vis-à-vis* their *Burk* tort claims either.

### D. PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES MUST FAIL.

Plaintiffs are not entitled to punitive damages.

In order to be awarded punitive damages for a violation of Title VII or § 1981, "a plaintiff must prove that the defendant acted with malicious, willful or gross disregard of a plaintiff's rights over and above intentional discrimination." *Juarez v. ACS Gov'tal Solutions Group, Inc.*, 314 F.3d 1243, 1247 (10th Cir. 2003). Reckless indifference or disregard has been interpreted as intentional discrimination "'in the face of' a perceived risk that its actions would violate federal law." *Juarez*, 314 F.3d at 1247. Whether sufficient evidence exists to support punitive damages awards in discrimination matters is a question of law. *Hysten v. Burlington N. Santa Fe Ry. Co.*, 530 F.3d 1260, 1276 (10th Cir. 2008); *EEOC v. Heartway Corp.*, 466 F.3d 1156, 1168 (10th Cir. 2006).

Here, Plaintiffs have no evidence that Unit intentionally discriminated against them, much less that it did so with malice or in the face of a perceived risk of violating law. Above, Defendants established that Plaintiffs are not entitled to any damages for race discrimination or harassment. Likewise, each Plaintiff has essentially dropped their claims of retaliation against Unit. Even if the Court did allow Plaintiffs' claims for retaliation, racial discrimination or racial harassment to go forward, any prayer for relief

that includes punitive damages for those claims should be denied at this point for lack of sufficient evidence.   There is no evidence that Unit acted with malice or reckless disregard toward McMunn.   It is further undisputed that Brad Schlottman never reported any retaliation or the two (2) isolated stray remarks by Powell.   There can be no finding of malice or reckless disregard as to Brad Schlottman.   Finally, the testimony by Jonathan Schlottman reveals unactionable racial remarks, and a lack of any form of retaliation, malice or reckless indifference to his concerns.   Summary judgment is proper.

### E.     PLAINTIFFS CLAIM OF SAME-SEX HARASSMENT MUST FAIL.

Plaintiffs claim they were subject to a hostile work environment due to alleged same-sex harassment by Battles.   Plaintiffs, however, cannot establish the conduct about which they complain was subjectively offensive.   Indeed, as the above undisputed material fact under this proposition reveal, *after* the alleged conduct occurred, the Schlottman brothers recruited their younger brother McMunn to come to work at Unit; helped him get a job at Unit; ensured he got a job on the same rig; and McMunn did so willingly, coming to work on his 18th birthday - the first day he was no longer prohibited under child labor laws.

A hostile work environment exists if the workplace is "permeated with discriminatory intimidation, ridicule, and insult [**11] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys.*, Inc., 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993) (internal citation and quotation omitted). The conduct in question must be judged by both a subjective and an objective standard. See id. To determine

whether an environment is hostile, courts must look at all the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. Boca Raton*, 524 U.S. 775, 787-88, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998) (internal quotation and citation omitted).

Plaintiffs admissions, testimony and conduct reveals they cannot meet the subjective standard.  Summary judgment is proper.

Respectfully submitted,

NEWTON, O'CONNOR, TURNER & KETCHUM,
A PROFESSIONAL CORPORATION


By:   */s/ Keith A. Wilkes*
      W. Kirk Turner, OBA #13791
      Keith A. Wilkes, OBA #16750
      15 West Sixth Street, Suite 2700
      Tulsa, Oklahoma  74119
      Telephone (918) 587-0101
      Facsimile (918) 587-0102
      kturner@newtonoconnor.com
      kwilkes@newtonoconnor.com

## <u>CERTIFICATE OF SERVICE</u>

⊗      I hereby certify that on June 15, 2010, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

   Mark Hammons, Esq.
   Mark@hammonslaw.com

   Tamara Gowens, Esq.
   Tamara@hammonslaw.com


I hereby certify that on _____, 2010, I served the foregoing document by certified mail on the following, who are not registered participants of the ECF System:

(None)

                                        /s/ *Keith A. Wilkes*_____
                                        Keith A. Wilkes