Bradley A. Schlottman
5/25/2010

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

1.  BRADLEY SCHLOTTMAN,        )
                               )
2.  JONATHAN SCHLOTTMAN,       )
                               )
3.  JOSEPH MCMUNN,             )
                               )
        Plaintiffs,            )
vs.                            )   NO. CIV-08-1275-C
                               )
1.  UNIT DRILLING COMPANY,     )
                               )
2.  SHANE BATTLES, an          )
    individual,                )
                               )
        Defendants.            )

**EXHIBIT**

tabbies®  3

\* \* \* \* \*

VIDEOTAPED DEPOSITION OF BRADLEY A. SCHLOTTMAN

TAKEN ON BEHALF OF THE DEFENDANTS

ON MAY 25, 2010

IN OKLAHOMA CITY, OKLAHOMA

\* \* \* \* \*

APPEARANCES:
        MS. TAMARA GOWENS, Attorney at Law, of the
firm, HAMMONS, GOWENS & ASSOCIATES, 325 Dean A.
McGee Avenue, Oklahoma City, Oklahoma 73102,
appearing on behalf of the Plaintiffs.

        MR. W. KIRK TURNER, Attorney at Law, of
the firm, NEWTON, O'CONNOR, TURNER & KETCHUM, 15
West Sixth Street, Suite 2700, Tulsa, Oklahoma
74119-5423, appearing on behalf of the Defendants.
VIDEOGRAPHER:  Mr. Walt Filipek, Courtroom Video
REPORTED BY:  MELINDA R. NIEVEZ, CSR, RPR

Bradley A. Schlottman
5/25/2010

1    treatment?

2       **A**    I did.

3       **Q**    Any other complaints of harassment or

4    discrimination in the workplace?

5       **A**    There is not.

6       **Q**    Do we agree -- and I just want to try to

7    set some dates for parameters' sake.  You told me

8    that you left the military in -- in October of 2007,

9    correct?

10      **A**    That is correct.

11      **Q**    And do we agree that you commenced

12   employment at Unit in November of 2007?

13      **A**    I did.

14      **Q**    All right.  Did you have any employment

15   between the date of your discharge from the military

16   and your beginning employment at Unit in November of

17   2007?

18      **A**    I did not.

19      **Q**    So is it -- is it true that the first

20   place of employment that you -- the first place you

21   went to work after your discharge from the military

22   was at Unit Drilling?

23      **A**    It was.

24      **Q**    And do we agree that your employment at

25   Unit started on November 21, 2007?

**Bradley A. Schlottman**
**5/25/2010**

1       **A**    I won't agree to the exact date at this

2    time.

3       **Q**    All right.  Well, do you have any reason

4    to dispute that it was November 21, 2007?

5       **A**    I do not.

6       **Q**    Okay.  You're just saying, I don't

7    remember what day it was?

8       **A**    Correct.

9       **Q**    You're not saying, I dispute that?

10      **A**    Correct.

11      **Q**    Okay.  And then do we also agree that your

12   employment -- that the last day that you actually

13   worked for Unit Drilling was in April of 2008?

14      **A**    That is correct.

15      **Q**    And do we also agree that the last day

16   that you worked -- actually physically worked for

17   Unit was April 15, 2008?

18      **A**    Again, I'm not going to agree to a date

19   for the simple fact of not remembering the exact

20   date.

21      **Q**    Do you have any reason to dispute if the

22   records of Unit said the last day that you actually

23   worked on Rig 150 was April 15, 2007?

24      **A**    I would have no reason to dispute it, no.

25      **Q**    And do we agree that you voluntarily left

**Bradley A. Schlottman**
**5/25/2010**

1       your employment at Unit?

2           **A**     That is incorrect.

3           **Q**     All right.  Were you terminated from

4       employment at Unit?  In other words, were you

5       involuntarily discharged?

6           **A**     I believe I was, yes.

7           **Q**     And who involuntarily discharged your

8       employment?

9           **A**     I believe it would have been Shane

10      Battles.

11          **Q**     Did Mr. Battles utter the words, you're

12      fired, or, your employment is terminated?

13          **A**     Not to me, no.

14          **Q**     Did he do it to anybody, to your

15      knowledge?

16          **A**     To my knowledge, I couldn't say.

17          **Q**     Did he do it to your brother, to your

18      knowledge?

19          **A**     Not that I know of, no.

20          **Q**     All right.  Did anybody ever voice to you

21      that your employment was being severed at Unit?

22          **A**     I believe Carl may have said something

23      about it, but I can't remember the exact on it.

24          **Q**     Do you remember that you were actually

25      scheduled to work on a -- on the following hitch and

Bradley A. Schlottman
5/25/2010

1       **Q**     All right.

2       **A**     I will attempt to explain to the best of

3    my memory. I've worked at numerous, so I may miss

4    one or two here and there.

5       **Q**     Sure. That's all I can ask you is the

6    best of your memory today, so -- and I may refresh

7    your memory about certain places if you have

8    forgotten. But I just want to get today the best of

9    your recollection of the places of your employment

10   and the dates of your employment as best you can

11   recall, okay?

12      **A**     Okay.

13      **Q**     So when you -- when you left Unit, is it

14   true that the first place you went to work was at

15   Nabors Drilling?

16      **A**     That is correct.

17      **Q**     All right. And do you recall how long a

18   period of time you worked at Nabors?

19      **A**     Approximately three to four months.

20      **Q**     All right. So that would be -- and,

21   again, roughly, that would be sometime in the August

22   to September of 2008 range? I'm just trying to

23   understand the chronology.

24      **A**     No. It was sometime in July, I believe --

25      **Q**     All right.

Bradley A. Schlottman
5/25/2010

Page 69

1          Q    All right.  How long -- how long did
2     you -- how long were you employed at Nomac?
3          A    Approximately 11 days, maybe 12.
4          Q    And where did you work next?
5          A    After Nomac, I believe it was Patterson.
6          Q    All right.  And how long did you work at
7     Patterson?
8          A    One hitch.
9          Q    Patterson Drilling, right?
10         A    Patterson UTI, I believe, is their
11    technical.
12         Q    All right.  And is that a drilling
13    company?
14         A    It is.
15         Q    All right.  And how long did you work at
16    Patterson?
17         A    Could you clarify "worked at"?
18         Q    How long were you employed by Patterson?
19         A    I was employed approximately one month.
20         Q    And then where did you work after
21    Patterson?
22         A    After Patterson, I believe I went to work
23    for Pioneer.
24         Q    Is that also a drilling company?
25         A    It is.

Bradley A. Schlottman
5/25/2010

1          **Q**     Uh-huh.   Did you understand that you had
2      an obligation to track how much money you actually
3      received from any -- how much income you actually
4      received from any source?
5                MS. GOWENS:   Object to the form.   You can
6      respond.
7                THE WITNESS:   I was not aware of that, no.
8          **Q**     (BY MR. TURNER)   Well, how would you know
9      at what level you were supposed to pay in taxes if
10     you didn't track how much income you actually
11     received?
12         **A**     I am not a tax attorney.   I have no clue
13     at what point I have to pay in taxes.
14         **Q**     But you made the decision -- you
15     personally made the decision that you weren't going
16     to pay taxes on whatever income you received from
17     your work at So Cal; is that true?
18         **A**     That is.
19         **Q**     In other words, nobody else told you, hey,
20     don't report this income?
21         **A**     That is correct.
22         **Q**     The -- we were talking about your
23     employment.   Did you ever work for a company called
24     Cactus Drilling?
25         **A**     Yes, I did.   I'm sorry.

**Bradley A. Schlottman**
**5/25/2010**

1        **Q**    You realize that's on the record, right,
2    your coughing?
3        **A**    That's okay.
4              Yes.  I did work for Cactus.  That is one
5    I had forgotten about.
6        **Q**    Okay.  And do you recall where in the
7    chronology you worked for Cactus?
8        **A**    Cactus would have been right after Nomac,
9    I believe, and right before Patterson.
10       **Q**    All right.  So your -- if I'm -- if my
11   chronology is correct, Nomac, Cactus, and then
12   Patterson?
13       **A**    I believe so, yes.
14       **Q**    Okay.  Are there any other -- any other
15   companies with whom you've worked that you can
16   recall as we sit here -- and I may ask you about
17   others.  But as we sit here today, is that the best
18   of your recollection?
19       **A**    After Pioneer, I went to work for another
20   one.  I mean, if you're talking to current, that
21   isn't a full account of it, no.
22       **Q**    Okay.  So let's go -- let's go to current.
23       **A**    Okay.  After Pioneer, I went to work
24   for H&P -- or no -- Pioneer, I went to work for
25   So Cal.  After So Cal, I went to work for DIRECTV.

**Bradley A. Schlottman**
**5/25/2010**

1       **A**     He did.

2       **Q**     And is that the reason why his employment

3       ended, is because he and his -- he got into an

4       argument with his driller?

5               MS. GOWENS:  Object to the form.  You can

6       respond.

7               THE WITNESS:  To my knowledge, the

8       argument was over his termination.

9       **Q**     (BY MR. TURNER)  Oh, the argument was your

10      brother disagreed with the termination of his

11      employment?

12      **A**     To my knowledge, that's what the argument

13      was over, yes.

14      **Q**     That's what he told you?

15      **A**     Correct.

16      **Q**     All right.  And do you know when his

17      employment ended or how long he worked?

18      **A**     Again, assuming that your terminology of

19      "worked" goes for the period of which he was

20      employed, I believe it was approximately three

21      weeks.

22      **Q**     Is it true, Mr. Schlottman, that you and

23      your brother, at least while you worked in the

24      drilling industry -- or actually at least since you

25      left Unit, that you and he worked at the same

Page 81

1       companies for the same periods of time?

2              MS. GOWENS:  I'm sorry.  Which brother?

3       **Q**      (BY MR. TURNER)  I'm sorry.  Jon.

4       **A**      Repeat the question, please.

5       **Q**      Yeah.  I just want to make sure the

6       record's clear, is that from the point where you

7       began -- you and your brother began to work at Unit,

8       from that point forward, up until Helmerich & Payne,

9       that you and your brothers worked at the same jobs

10      at identical times?

11             **A**      I can't recall a time where that statement

12      would be incorrect.

13             **Q**      All right.  And is it also true that if

14      one of you got terminated from your employment, the

15      other one quit that particular job during that

16      period of time?

17             **A**      That is correct.

18             **Q**      All right.  In other words, if you got

19      terminated involuntarily, your brother would quit

20      that job at that time?

21             **A**      That is correct.

22             **Q**      And that happened, didn't it?

23             **A**      It did.

24             **Q**      All right.  And the same would be true of

25      him.  He was involuntarily terminated, and you quit

Bradley A. Schlottman
5/25/2010

1     your job as a result of his involuntary termination?

2         **A**    That is correct.

3         **Q**    But that did not happen at H&P; is that

4     true?

5         **A**    That is correct.

6         **Q**    You decided to stay employed at H&P?

7         **A**    That is correct.

8         **Q**    And you have continued your employment at

9     H&P from November of '09 until May of 2010?

10        **A**    That is correct.

11        **Q**    Do you have any present intention of

12    leaving your employment at Helmerich & Payne?

13        **A**    I do not.

14        **Q**    Do you know how much money you were making

15    on an hourly basis at the time that you left

16    employment at Unit?

17        **A**    I don't remember the exact dollar amount.

18        **Q**    Do you recall a neighborhood or an

19    estimate?

20        **A**    Somewhere between 17 and $20 an hour.

21        **Q**    All right.  And up and to that point in

22    time, is that the most money that you ever made on

23    an hourly basis?

24        **A**    On an hourly basis, I would say that was

25    true.

Bradley A. Schlottman
5/25/2010

1       **Q**    All right.  Was it the most money you'd
2   ever made, just for purposes of income?
3       **A**    I can't swear to that being the most I've
4   ever made.
5       **Q**    All right.  When you went -- when you left
6   employment at Unit and went to work at Nabors, did
7   you make more or less money on an hourly basis than
8   you made at Unit?
9       **A**    Could you clarify the question there just
10  a little bit?
11      **Q**    Sure.  What part do you not understand?
12      **A**    I'm -- is this before expenses are
13  figured, or is this just --
14      **Q**    I'm just trying to understand your hourly
15  rate.
16      **A**    Was the hourly rate more?  Yes.
17      **Q**    And do you know how much more?
18      **A**    I can't remember, no.  I can't remember
19  the exact amount I was making for either company.
20      **Q**    All right.  Do you recall the range -- I
21  know you told me you thought the range was in the
22  17- to $20-an-hour range.  Do you recall what the
23  Nabors Drilling range was?
24      **A**    I believe it was mid 20s.
25      **Q**    When you worked at Unit, were you required

**Bradley A. Schlottman**
**5/25/2010**

1     to pay your own expenses?

2          **A**    At the start of it, I was receiving

3     per diem, so I don't consider that to be completely

4     paying for my expenses.  I was required to pay for

5     anything that exceeded my per diem.

6               There at the end, whenever they

7     restructured everything to where they did away with

8     per diem and raised the hourly rate, at that point I

9     was required to pay for all of my expenses.

10         **Q**    All right.  And your expenses would

11    include your travel expenses?

12         **A**    It would.

13         **Q**    And it would include your meal expenses?

14         **A**    It would.

15         **Q**    All right.  And then did -- did Unit

16    provide a place for you to stay?

17         **A**    They did.

18         **Q**    All right.  And at Nabors were you

19    required to pay your own expenses?

20         **A**    I was.

21         **Q**    And would that include your travel

22    expenses?

23         **A**    It would.

24         **Q**    And would that include your meal expenses?

25         **A**    It would.

**Bradley A. Schlottman**
**5/25/2010**

1        **Q**    And would it include housing expenses?

2        **A**    No.  We were provided a bunkhouse.

3        **Q**    All right.  So the only -- the only

4    difference in expense would be the -- the actual

5    amount of travel, the number of miles that you

6    traveled from one job to the next?

7            I mean, as between Unit, driving to Texas

8    or driving to Oklahoma was a shorter travel in terms

9    of amount of gas expense than -- than going to

10   Colorado?

11       **A**    No, that's not true.  The grocery rate and

12   everything else, if I remember right, was a little

13   bit higher.  The cost of living was higher in Utah

14   than it was in Texas or Oklahoma, either one.

15       **Q**    All right.  How much higher?

16       **A**    I -- I can't remember an exact amount.  I

17   remember fuel was considerably higher for up there.

18       **Q**    All right.  How much higher?

19       **A**    I can't -- couldn't tell you the exact

20   amount.  I just remember it was a concern of ours.

21       **Q**    Is it -- is it true that the hourly rate

22   that you received and the number of hours that you

23   worked more than made up for any difference in

24   expense?

25           In other words, the net amount of money

**Bradley A. Schlottman**
**5/25/2010**

1    that you made was substantially more at Nabors than

2    it was at Unit?

3         **A**    I would not agree with that statement, no.

4         **Q**    Was it more than you made at Unit?

5         **A**    I -- after figuring expenses, I couldn't

6    testify for sure whether it was or not.

7         **Q**    Was it less?

8         **A**    Again, I couldn't testify for sure whether

9    it was more or less.

10        **Q**    You don't have any testimony, as we sit

11   here today, that it was --

12        **A**    I would say it was comparable.

13        **Q**    So was the -- you would say it was roughly

14   even, even though you were making more on a --

15   substantially more on an hourly basis, right?

16        **A**    To the best of my knowledge, I would say

17   that it was comparable, yes.

18        **Q**    Okay.  So you don't -- you don't think you

19   made less, right?

20        **A**    Again, without something to remind me of

21   the exact amounts that it varied, I couldn't testify

22   for sure.

23        **Q**    Okay.  We'll talk about that as we go,

24   just to make sure I understand what your testimony

25   is in that regard, okay?

Bradley A. Schlottman
5/25/2010

 1      **A**    I do.

 2      **Q**    Okay.  And you -- don't you admit that you

 3      lied on your employment application --

 4              MS. GOWENS:  Object --

 5      **Q**    (BY MR. TURNER)  -- with Nabors Drilling?

 6              MS. GOWENS:  Object to the form.

 7              THE WITNESS:  That is correct.

 8      **Q**    (BY MR. TURNER)  You -- you indicate here

 9      on the application, Exhibit 26, that the date of

10      your application was 21 April, 2008.  Do you see

11      that on the first page?

12      **A**    I do.

13      **Q**    And then look at the last page, if you

14      would, on the -- where you've signed it, and the

15      date of that document is again 21 April, 2008.

16      **A**    Is there a question there?

17      **Q**    Yes.  Is that true?

18      **A**    That is true.

19      **Q**    Okay.  And does this refresh your

20      recollection as to the date you actually filled out

21      your application?

22      **A**    I wouldn't say it refreshes it.  But given

23      it is in my handwriting, I would believe it to be

24      true.

25      **Q**    Do you have any reason to dispute or deny

**Bradley A. Schlottman**
**5/25/2010**

1    at Unit?

2         **A**    I did.

3         **Q**    I also notice here that you say that your

4    immediate supervisor was Carl Powell.  Do you see

5    that?

6         **A**    I do.

7         **Q**    Was that true?

8         **A**    It is.

9         **Q**    He was your immediate supervisor?

10        **A**    He was.

11        **Q**    All right.  And then right next to that,

12   you say -- "Summarize the nature of work performed

13   and job responsibilities."  Do you see that?

14        **A**    I do.

15        **Q**    And it says, "Floor hand through motors."

16        **A**    It does.

17        **Q**    That was not true, was it?

18        **A**    It was.

19        **Q**    You were a motor -- you did -- you worked

20   as a motor man?

21        **A**    It -- it says worked performed --

22        **Q**    Right.

23        **A**    -- so that -- that statement is true.

24        **Q**    Oh, you're saying -- so you don't believe

25   that's misleading at all --

**Bradley A. Schlottman**
**5/25/2010**

1       **A**      It is not.

2       **Q**      -- that the work that you did as a

3   motor -- that you didn't do any work as a motor man?

4       **A**      That statement is 100 percent accurate.

5       **Q**      Okay.  And then here it says the reason

6   for leaving is still employed.  Was that true?

7       **A**      It is.

8       **Q**      And then I notice here on your pay that

9   you say $12 an hour that you started at, up to

10   $19.30 an hour?

11       **A**      That is correct.

12       **Q**      All right.  And do I understand, then,

13   that at Unit, between November of 2007 to April of

14   2007, you received raises in hourly pay, that range

15   from $12 in the beginning to $19.30 an hour at the

16   end?

17       **A**      That is correct.

18       **Q**      All right.  So you received about $7 an

19   hour in increase in wages; is that true, on an

20   hourly basis?

21       **A**      Okay.  On an hourly basis, that is true.

22       **Q**      Okay.  Were you a mechanic for four and a

23   half years in the Army?

24       **A**      I was.

25       **Q**      All right.  And had you been a floor man

**Bradley A. Schlottman**
**5/25/2010**

1      **A**    He was.

2      **Q**    He was a tool pusher, wasn't he?

3      **A**    Correct.

4      **Q**    He wasn't the driller on that rig, was he?

5      **A**    Correct.

6      **Q**    Why didn't you identify your driller if he

7    was your immediate supervisor?

8      **A**    Because at that point I had -- I didn't

9    have a set driller.  I was going through driller

10    after driller, so I didn't have a set supervisor.

11      **Q**    All right.  I notice here that you said

12    your salary was $26.50 an hour at Nabors.  Do you

13    see that?

14      **A**    I do see that.

15      **Q**    And that's your handwriting, right?

16      **A**    It is.

17      **Q**    Okay.  And this would have been within a

18    month of the end of your employment at Nabors,

19    correct?

20      **A**    Correct.

21      **Q**    So you certainly would have a better

22    recollection of the actual amount hourly you were

23    receiving, right?  That would be --

24      **A**    I would say that would be correct.

25      **Q**    Okay.  So you were making -- you were

Page 120

1        making $26.50 an hour.  And then you said here the
2        reason for leaving was the distance was too far to
3        travel to Utah.
4             **A**    That's what is written there, yes.
5             **Q**    That's not true, is it?
6             **A**    No, it is not.
7             **Q**    That's a lie, isn't it?
8             **A**    That it is.
9             **Q**    And you didn't want to tell them that you
10       had been involuntarily terminated, didn't you?
11            **A**    That is correct.
12            **Q**    Because you thought you might not get the
13       job; isn't that right?
14            **A**    That is correct.
15            **Q**    You don't -- do you think under those
16       circumstances that it's okay to lie about what
17       happened with your prior employment, in that
18       particular circumstance where you wrote down
19       something that was not true?
20            **A**    Given the financial stress of my family --
21            **Q**    No, sir.
22            **A**    -- at the time, I believe it was, yes.
23            **Q**    I'm just asking about whether or not you
24       believe morally and ethically that that's an
25       appropriate way to communicate to a prospective

**Bradley A. Schlottman**
5/25/2010

1       **Q**     (BY MR. TURNER)   It is.   I'm telling you

2    it's mentioned in there.

3            But is it your testimony that you believe

4    that because of your financial stress, that it's

5    okay to lie to a prospective employer?   Is that your

6    testimony here to this jury?

7       **A**     Yes.

8       **Q**     The next place of employment you

9    identified is Unit Drilling.   Do you see that?

10      **A**     I do.

11      **Q**     And you -- I see here you identified that

12   you worked the floors.   Was that correct?

13      **A**     It was.

14      **Q**     All right.   And then your dates of

15   employment were 10/10/07 to 4/20/08.   Do you see

16   that?

17      **A**     I do.

18      **Q**     That wasn't true, was it?

19      **A**     No, it was not.

20      **Q**     That's a -- that's a lie?

21      **A**     It was.

22      **Q**     And I notice here that you identified on

23   this document as -- your supervisor as Shane

24   Battles.

25      **A**     That is correct.

1    **Q**    And Mr. Battles wasn't your immediate
2    supervisor, was he?
3    **A**    It doesn't specify immediate supervisor.
4    **Q**    So you felt like Mr. Battles would give
5    you a better reference than Mr. Powell would?
6    **A**    I wouldn't attest as to why I put him
7    down.
8    **Q**    Well, you certainly identified him as the
9    person who was your supervisor, right?
10   **A**    I did.
11   **Q**    And then here you identified your salary
12   as $19.30 per hour.
13   **A**    I did.
14   **Q**    Does that refresh your memory as to how
15   much money you made on an hourly basis at Unit?
16   **A**    I wouldn't say it refreshes my memory, no.
17   **Q**    Do you have any reason to dispute your own
18   document?
19   **A**    I do not.
20   **Q**    Okay.  So based upon that, would you agree
21   with me that at least insofar as it relates to your
22   employment at Nabors, you were making more than
23   $7 per hour on an hourly basis?
24   **A**    I would.
25   **Q**    And do I understand that a typical hitch,

Bradley A. Schlottman
5/25/2010

1              MS. GOWENS:  Object to the form.

2        **Q**   (BY MR. TURNER)  Did you tell him that --

3    what -- did you tell him that the information on

4    your application was a lie?

5        **A**   Yes.

6        **Q**   And he told you it's okay?

7        **A**   Yes.

8        **Q**   And do I understand your testimony that --

9    that but for him telling you it was okay, that you

10   would have corrected your application?

11       **A**   I did not say that.

12       **Q**   So you would not have corrected your

13   application?

14       **A**   I can't say whether I would have or not.

15       **Q**   Well, you didn't change it, did you?

16       **A**   No, I did not.

17       **Q**   And it's untruthful, isn't it?

18       **A**   It is.

19       **Q**   Why did you leave employment at Nomac?

20       **A**   I left employment at Nomac because after

21   three days on one hitch and one day on the other,

22   they had come up with an excuse to fire my brother

23   already, and it was hinted that I wouldn't be long

24   to follow.

25       **Q**   Why -- why did -- why did they come up

**Bradley A. Schlottman**
**5/25/2010**

1   marked out there, and then there's a date of

2   8/3/08 there, yes.

3       Q   Yeah.  It looks like 8/4/08 was marked

4   out --

5       A   I can't --

6       Q   -- and 8/3/08 was written above it; is

7   that correct?

8       A   I can see the 8/3.  As to what the date

9   below it is, I couldn't even begin -- they've marked

10   it out so well that you can't really distinguish

11   what it is.

12       Q   All right.  And then it's got a date of

13   termination 8/15/08.  Do you see that?

14       A   I do.

15       Q   August 15; is that right?

16       A   That is the date, yes.

17       Q   Okay.  And then it says that you

18   voluntarily terminated your employment.  Was that

19   true?

20       A   I don't believe that to be true.

21       Q   All right.  And then right below that it

22   says the reason for termination, and it's got a lot

23   of -- like, it's got no call, no show,

24   insubordination.  And the one that's checked is

25   called "voluntary resignation."

Bradley A. Schlottman
5/25/2010

1      **A**    I see that, yes.

2      **Q**    Was that true?

3      **A**    I don't believe so, no.

4      **Q**    Okay.  Then below -- down below it says,

5      "If termination was voluntarily, what reason did the

6      employee give for resignation?"  This says, Brad

7      quit because his brother was fired for poor work

8      performance, and he also quit in the middle of his

9      work tower."  Is that what that says?

10     **A**    That is what it reads, yes.

11     **Q**    Do you dispute the accuracy of this

12     document --

13     **A**    I do.

14     **Q**    -- insofar as it relates to that?

15     **A**    I do.

16     **Q**    Okay.  Is it -- do you deny that you

17     voluntarily resigned?

18     **A**    I do.

19     **Q**    And is it your testimony that you were

20     involuntarily terminated?

21     **A**    It is.

22     **Q**    All right.  And what reason was given to

23     you for the -- for the -- for the involuntary

24     termination of your employment at Nomac?

25     **A**    I was told they found a reason to fire

**Bradley A. Schlottman**
**5/25/2010**

Page 144

```
1      Jon, they would find one for me.
2           Q    And who told you that?
3           A    The floor hand I worked with.
4           Q    The floor hand you worked with?
5           A    That is correct.
6           Q    Did anybody in management tell you that?
7           A    I don't have a memory of anybody in
8      management telling me that, no.
9           Q    So the answer is no?
10          A    I don't have a memory of it, is my answer.
11          Q    You can only testify about what you
12     remember, right?
13          A    That's correct.
14          Q    So your testimony is it did not happen?
15          A    That is not what I said.  My testimony is
16     I do not remember it happening.
17          Q    Well, I'm -- I guess I'm trying to
18     understand.  Is it your testimony that, I did have a
19     conversation with somebody in management, but I just
20     don't remember it?  Is that your testimony?
21          A    No.  My testimony is that if -- if it was
22     discussed to me from management, I don't recall it
23     at this time.
24          Q    Right.  But you do recall having a
25     conversation with some floor hand --
```

Bradley A. Schlottman
5/25/2010

Page 145

1      **A**    I do.

2      **Q**    -- that said if they found a reason to

3   terminate your brother, they'll find a reason to

4   terminate you?

5      **A**    I do.

6      **Q**    Did you ever confirm the accuracy of that

7   information?

8      **A**    I asked my driller at the time why they

9   were firing Jon --

10     **Q**    Uh-huh.

11     **A**    -- and he listed off a couple of the

12   reasons, and we proceeded to have --

13     **Q**    What reasons did he give you?

14     **A**    I don't remember the exact details of it.

15   One of them had something to do with -- the only one

16   I can remember for sure, what it had to do with was

17   him not mixing his towerly treatment 30 minutes

18   prior to the end of shift.

19     **Q**    All right.  And -- but at the time that

20   your brother was terminated, did you walk off the

21   job with him?

22     **A**    I did not walk off the job with him, no.

23     **Q**    When did you leave the employment -- when

24   did you leave the job site?

25     **A**    I -- I left at the same time Jon did, yes.

Bradley A. Schlottman
5/25/2010

1     **Q**   All right.  So -- and was he -- his

2   employment was terminated, wasn't it?

3     **A**   It was.

4     **Q**   All right.  And did anybody ever tell you,

5   hey, your job is being terminated?  Anybody in

6   management tell you that?

7     **A**   It was implied to me that --

8     **Q**   No, sir.  I said did anybody ever tell you

9   that, speak to you those words.

10     **A**   If management had directly told me that, I

11   don't remember that happening, no.

12     **Q**   All right.  So you can't testify that it

13   happened, can you?

14     **A**   No.  I would not be able to testify.

15     **Q**   All right.  So in any event, you left

16   employment with your brother after he was

17   terminated, correct?

18     **A**   That is correct.

19     **Q**   All right.  And do you recall how much

20   money you were making on an hourly basis while you

21   worked at Nomac?

22     **A**   I can't recall.

23     **Q**   Was it more or less than you made at Unit?

24     **A**   Again, I can't recall.

25     **Q**   Where -- where were you working at Nomac,

Bradley A. Schlottman
5/25/2010

1    when you worked at Nomac?

2        **A**    At one point in time I could have told you

3    the exact town.  Southwestern Oklahoma, more south

4    than west.

5        **Q**    All right.  Was it -- was it closer to

6    your home than working in Antlers?

7        **A**    I don't believe so --

8        **Q**    Do you think it was --

9        **A**    -- but I couldn't testify.  I would say it

10   was probably comparable.

11       **Q**    Do you think it was further away?

12       **A**    I think it would have been roughly about

13   the same.

14       **Q**    About the same distance?

15       **A**    Correct.

16       **Q**    All right.  And did Nomac pay for your

17   travel expenses?

18       **A**    I don't recall whether I was receiving

19   per diem or not through them.  I don't believe I

20   was, but I wouldn't swear that I wasn't.

21       **Q**    All right.  And then what about your --

22   and per diem would cover your food cost?

23       **A**    Well, so they claim, yes.

24       **Q**    All right.  And did they pay for -- did

25   they provide a place to stay?

**Bradley A. Schlottman**
**5/25/2010**

1       **A**    They did.

2       **Q**    So in terms of your expenses, your

3    expenses would have been -- would have been about

4    the same as they were at Unit; is that right?

5       **A**    No, that's not right.  It would have been

6    a little bit more.  The bunkhouse was off location.

7       **Q**    Well, wasn't the bunkhouse off location

8    in -- at Rig 150?

9       **A**    Oh, well, at the time of termination with

10   Unit it was, yes.

11      **Q**    All right.  So it would have been about

12   the same in terms of the expenses?

13      **A**    I would guess that it would be roughly

14   about the same in expenses.

15      **Q**    Okay.  And do -- you do know, don't you,

16   that you made more money on an hourly basis at Nomac

17   than you made at Unit, right?

18      **A**    I do not know that, no.

19      **Q**    You don't remember that?

20      **A**    No.  I do not remember what I was making.

21      **Q**    All right.  As I understand, after you

22   left Nomac, then you went to work for Cactus?

23      **A**    I believe that's correct, yes.

24      **Q**    And do you know where you worked when you

25   worked for Cactus?

**Bradley A. Schlottman**
**5/25/2010**

1    **A**    I can't say for sure whether or not.   I

2    think it was all right.  I mean, I -- was I -- I

3    don't know.  Reword the question.

4         **Q**    Did you think --

5         **A**    No.  Probably not, no.

6         **Q**    Do you think it was improper for them to

7    lie to you?

8         **A**    I don't believe it was their intent to lie

9    to me whenever I hired on with them.  I think it was

10   an unfortunate circumstance that caused it.

11        **Q**    So you don't believe they lied to you?

12        **A**    I don't believe they intentionally lied to

13   me.

14        **Q**    Well, is there any other type of lie

15   besides an intentional lie?

16        **A**    Yes.

17        **Q**    There's an unintentional lie?

18        **A**    Yes.

19        **Q**    Really?

20        **A**    Yes, I believe there is.

21        **Q**    All right.  And do you believe they

22   unintentionally lied to you?

23        **A**    I do.

24        **Q**    Did you ever -- and what happened to your

25   employment?  In other words, how did it end?

Bradley A. Schlottman
5/25/2010

1       **A**     It ended whenever I was involuntarily
2    terminated for not showing up to the rig where they
3    had permanently assigned me at a lower pay rate than
4    what I had hired on for.
5       **Q**     And so you -- you refused to come to work
6    at that lower rate; is that --
7       **A**     That is correct.
8       **Q**     Okay.  Did you ever file any sort of a
9    complaint against Cactus?
10      **A**     Again, define "file."
11      **Q**     Pursue, assert.
12      **A**     I had a verbal conversation with the -- I
13   think she's over HR for Cactus there in the Oklahoma
14   City office --
15      **Q**     Uh-huh.
16      **A**     -- about the fact that I didn't appreciate
17   that I wasn't getting to go out on the new rig and
18   that they were putting me at a permanent floor hand
19   position, yes.
20      **Q**     All right.  And what did she say?
21      **A**     She said that unfortunately, that was all
22   she could do, that she has no control over what the
23   superintendents decide to do with me.
24      **Q**     Okay.  What did you do about that?
25      **A**     I left it at that.

Bradley A. Schlottman
5/25/2010

1          Q    Okay.  So that was the only conversation
2     you had is you just didn't feel like it was fair?
3          A    That's correct.
4          Q    So you -- so was your employment
5     involuntarily terminated because you didn't show up?
6          A    It was.
7          Q    And then did your brother Jon leave his
8     work at Cactus because of your involuntary
9     termination?
10         A    I'm not for sure as to the exact details
11    behind his ending of employment with Cactus.
12         Q    You don't know that?
13         A    I can't testify one way or the other on
14    his.
15         Q    What do you think happened?
16         A    I believe he was involuntarily terminated
17    because he refused to work in the conditions they
18    were sending him out in.
19         Q    All right.
20         A    But as far as testifying to it, I -- I
21    can't say for sure.
22         Q    Were you working on different rigs at that
23    time?
24         A    Unfortunately, we were, yes.
25         Q    All right.  Let me hand you what's been

**Bradley A. Schlottman**
**5/25/2010**

1       **Q**    Well, who -- who -- who told you that they

2    knew anything about your employment at Unit?

3       **A**    The individual that interviewed us.

4       **Q**    Who was that?

5       **A**    I cannot recall his name.

6       **Q**    So everything you know is hearsay from

7    that person?

8       **A**    No.

9            MS. GOWENS:   Object to the form.

10      **Q**    (BY MR. TURNER)   Go ahead.

11      **A**    I've answered.

12      **Q**    You can't identify that person?

13      **A**    As my memory serves me today, no, I

14   cannot.   Without something to aid me in who did my

15   interview, I can't sit here and tell you his name,

16   no.

17      **Q**    But -- but you didn't -- you didn't even

18   include Nomac, right?

19      **A**    That is correct.

20      **Q**    But you included Unit on this application?

21      **A**    I did, yes.

22      **Q**    All right.   Do you agree that you

23   intentionally omitted information on your

24   application about your employment history?

25      **A**    I did, yes.

Bradley A. Schlottman
5/25/2010

1      **Q**   And that that was a lie?

2      **A**   An omission isn't necessarily a lie, as

3  far as I understand.

4      **Q**   It's a falsification of this employment

5  application, though, isn't it?

6      **A**   Right.  But omission -- I believe it

7  states to pertinent.  I believe it says omit

8  pertinent information.

9      **Q**   Yeah.  Or have provided any false

10  information?

11      **A**   So if I didn't believe it to be pertinent,

12  then -- then I wouldn't have been in the wrong

13  for --

14      **Q**   Okay.  So that's your --

15      **A**   -- omitting it.

16      **Q**   That's the way you construed that --

17      **A**   It is.

18      **Q**   -- is that's their -- you read this

19  closely enough to say, oh, that's probably -- my

20  last employment that ended four days ago

21  involuntarily is probably not pertinent to their

22  decision about whether to hire me.  That's how you

23  construed that?

24      **A**   I can't say for sure that it was.

25      **Q**   Well, but you read this closely enough to

**Bradley A. Schlottman**
**5/25/2010**

1    employers for the prior ten years, right?

2    **A**    That is correct.

3    **Q**    So that would be false, wouldn't it?

4    **A**    No.  That would be an omission that wasn't

5    pertinent.

6    **Q**    Okay.  So when you write Nabors is your

7    most recent, most current employer, that wouldn't --

8    that would be false, wouldn't it?

9    **A**    That part would be false, yes.

10    **Q**    All right.  So that would be a false

11    statement?

12    **A**    That -- that would be, yes.

13    **Q**    Okay.  And then here -- I notice here on

14    Nabors that you identified yourself as a motor man.

15    Were you a motor man at Nabors?

16    **A**    I was.

17    **Q**    Okay.  And then do I also understand

18    that -- you also said the reason that you left

19    Nabors was too far to drive?

20    **A**    That is what it says, yes.

21    **Q**    That's a lie, isn't it?

22    **A**    Yes, it is.

23    **Q**    So that would be false information?

24    **A**    It would be, yes.

25    **Q**    And then at Unit you indicated that you

**Bradley A. Schlottman**
**5/25/2010**

1      worked from October of '07 to April of '08?

2           **A**    Again, that is what I wrote, yes.

3           **Q**    That's a lie, isn't it?

4           **A**    Wait a minute.  Could you -- oh, sorry.

5      We're still on Nabors?  Could you repeat the

6      question?

7           **Q**    Yeah.  Unit -- you with me, Unit?

8           **A**    Unit.  Okay.

9           **Q**    It says you worked from October of '07 to

10     April of '08.

11          **A**    That is incorrect.

12          **Q**    That's a lie?

13          **A**    That is a lie, yes.

14          **Q**    Right.  You didn't work -- you didn't

15     begin to work at -- you were in the service in

16     October of '07, weren't you?

17          **A**    Not at the date that's on the paper, no.

18          **Q**    Okay.  Were you trying to testify that --

19     I mean, that you got a job immediately after you

20     left the service?  Is that the purpose for

21     falsifying that information?

22          **A**    I don't recall what the purpose of

23     falsifying it was.

24          **Q**    What was your motivation there to -- to

25     lie about the dates of your employment at Unit?

Page 164

1       acknowledgment section.

2            Q    Okay.  Good.  I hope you tell that to the

3       jury.  I really do.

4                 MS. GOWENS:  Object to the form.

5       Argumentative.  Wait for a question.

6            Q    (BY MR. TURNER)  I hope that's your

7       explanation.

8                 MS. GOWENS:  Object to the form again.

9       Wait for a question.

10           Q    (BY MR. TURNER)  What happened to your

11      employment at Cactus?

12           A    It was terminated.

13           Q    Uh-huh.  Involuntarily?

14           A    I believe it was, yes.

15           Q    Because you no-called, no-showed?

16           A    I can't testify as to whether it was a no

17      call, no show.

18           Q    Was it a no show?

19           A    It was.

20           Q    You just don't know whether you called or

21      not?

22           A    Correct.  I can't testify for sure whether

23      I did or not.

24           Q    Let me -- let me hand you what's been

25      marked as Exhibit 31.  And, first of all, I notice

**Bradley A. Schlottman**
**5/25/2010**

1   that the document is dated on the 14th day of

2   October.  Do you see that?

3        **A**    I do see that.

4        **Q**    All right.  So that would have been within

5   a couple of months of your employment starting at

6   Cactus; is that correct?

7        **A**    That would be correct, yes.

8        **Q**    And where were you assigned in October of

9   '08?  What -- it says you were on Rig 301.  Do you

10  know where that was located at the time of your

11  employment ending?

12       **A**    I do not.

13       **Q**    You don't remember whether it was in

14  Oklahoma or Texas?

15       **A**    I can't recall where 301 was located.

16       **Q**    All right.  Do you agree that that's the

17  rig to which you were assigned?

18       **A**    I can't testify -- I was under the

19  assumption it was 331 I was assigned to.  But,

20  again, I -- my memory isn't clear enough on that.  I

21  was on so many rigs with them.

22       **Q**    Okay.  It says here the reason for your

23  status change was no call, no show -- I'm sorry --

24  no show, no call.

25       **A**    That is what it says, yes.

Page 166

1      **Q**    Do you have any reason to dispute that?

2      **A**    I -- I vaguely remember having a

3      conversation, again, with Christy in HR about the

4      fact that I didn't appreciate being put on a rig

5      that I wasn't hired for.  So I would assume I would

6      have implied something in there, but I -- I can't

7      testify definitively about whether I was a no call,

8      no show.

9      **Q**    You don't have any evidence, do you, that

10     contradicts this document, do you?

11     **A**    Just my --

12            MS. GOWENS:  Object to the form.  You can

13     answer.

14            THE WITNESS:  Just my vague recollection

15     of calling Christy, but I can't remember without

16     something to help me revisit the conversation as to

17     exactly what was stated during that or exactly when

18     it took place.  But I'm pretty sure it was right

19     around -- I can't remember if it was right before or

20     right after I was supposed to be out there or what,

21     but --

22     **Q**    (BY MR. TURNER)  Okay.  So you don't

23     remember the timing well enough to be able to

24     dispute that it was a no call, no show; is that

25     right?

Bradley A. Schlottman
5/25/2010

1        **A**     To the best of my knowledge today, no.

2        **Q**     All right.  Did I ask you how much money

3    you were making at Nomac on an hourly basis?

4        **A**     I can't remember if you did.  I think you

5    did.  But, again, I couldn't tell you for sure what

6    I was making there.

7        **Q**     Was it more or less than you were making

8    at Unit?  Do you recall?

9        **A**     Again, I can't remember what I was making,

10   so I wouldn't be able to answer whether it was more

11   or less.

12       **Q**     All right.  And then you went to work

13   where?  Patterson; is that right?

14       **A**     After Cactus, I believe it was Patterson.

15       **Q**     Uh-huh.  And how long did you work for

16   Patterson?

17       **A**     Less than a month.

18       **Q**     And what was the reason for you leaving?

19       **A**     I was terminated.

20       **Q**     And why were you terminated?

21       **A**     Because the driller didn't appreciate me

22   making him look bad in front of a company man.

23       **Q**     All right.  Did you get into an argument

24   with the driller?

25       **A**     I did.

Bradley A. Schlottman
5/25/2010

1      employers; is that true?

2          **A**     That is correct.

3          **Q**     You omitted Nomac; is that right?

4          **A**     That is correct.

5          **Q**     So that wasn't -- that would be a

6      falsification of the employment application, right?

7          **A**     Do what, now?

8          **Q**     That would be a falsification of the

9      employment application where it asked you for the

10     name and address of last two employers?

11         **A**     That is correct.

12         **Q**     So that would be a lie, wouldn't it,

13     because those weren't your last two employers?

14         **A**     That is correct.

15         **Q**     All right.  And then it asked for your

16     employer -- the name of your employer, and you

17     didn't provide either of those, right?

18         **A**     That is correct.

19         **Q**     Okay.  Now, here it also says that with

20     regard to Ike Moore -- and Mr. Moore, is that the

21     person that filled out the document, Exhibit 31?

22         **A**     Yeah.  That's the name that's on that

23     document, yes.

24         **Q**     So he would have been a person affiliated

25     with Cactus Drilling?

Bradley A. Schlottman
5/25/2010

1     **A**    That is correct.

2     **Q**    All right.  And then here it says that

3    the -- your employment at Cactus Drilling was from

4    August 26, 2008 to October 15, 2008.  Do you see

5    that?

6     **A**    I see those -- I think those are the

7    dates.  It's kind of hard to read.

8     **Q**    Was that true?

9     **A**    No, it's not true.

10     **Q**    All right.  And then the reason you

11    left -- that wasn't the reason you left Cactus, was

12    it, to come here?

13     **A**    No, that's not correct.

14     **Q**    So that's a lie, isn't it?

15     **A**    That is, yes.

16     **Q**    That's a falsification of your employment

17    application?

18     **A**    It is, yes.

19     **Q**    The next one here says Kurtis -- is it

20    Howe, H-o-w-e?

21     **A**    It is.

22     **Q**    All right.  And where was Mr. Howe

23    employed?

24     **A**    I can't really testify as to where he was

25    employed at the time of this application.

Bradley A. Schlottman
5/25/2010

1       **Q**    You can't say.  Okay.

2            Did you work motors at Nabors?

3       **A**    I did.

4       **Q**    All right.  And then here it says you

5    worked from April of '07 to August of '08, so that

6    would have been about -- that would have been about

7    16 months for Kurtis Howe.  Did you work 16 months

8    for Mr. Howe?

9       **A**    I did not.

10      **Q**    All right.  So that's a lie, isn't it?

11      **A**    Yes, it is.

12      **Q**    And then it says the reason you left

13    working for him was to move to a new rig.  That's

14    also a lie, isn't it?

15      **A**    It is.

16      **Q**    That's a falsification of your employment

17    application.  True?

18      **A**    That is true.

19      **Q**    Now, I notice down here that your

20    signature's down at the bottom, where you've signed

21    the document; is that correct?

22      **A**    That you noticed it?  I can't say whether

23    you noticed it or not.

24      **Q**    Is that your signature at the bottom of

25    the page?

**Bradley A. Schlottman**
**5/25/2010**

1    was terminated on the 12th day of November for

2    "talking back to the driller and telling driller

3    what he is going to do."  Did I read that correctly?

4         **A**    You did.

5         **Q**    All right.  And do you dispute the

6    documentation created by Patterson with regard to

7    the termination of your employment?

8         **A**    No.  I'll let it stand.  I wouldn't

9    dispute it.

10        **Q**    All right.  And there's no doubt, is

11   there, that there was an involuntary termination?

12        **A**    There is no doubt about that.

13        **Q**    All right.  And did your brother leave at

14   the same time that you left?

15        **A**    I don't believe so, no.

16        **Q**    You think he stayed employed at Patterson

17   while you -- after you left employment?

18        **A**    I believe he did, yes.

19        **Q**    How long did he remain employed, to your

20   knowledge?

21        **A**    To my knowledge, I couldn't tell you.

22        **Q**    Do you have a memory about that,

23   Mr. Schlottman, at all, about how long he stayed

24   employed?

25        **A**    Not anything specific, no.

**Bradley A. Schlottman**
**5/25/2010**

1          **Q**     Do you recall how much money you were

2     making on an hourly basis at Patterson?

3          **A**     I do not.

4          **Q**     You have no recollection?

5          **A**     (Shakes head.)

6          **Q**     Do you have a range of how much money you

7     were making on an hourly basis?

8          **A**     It was Wyoming, so probably mid 20s again,

9     but I'm not for sure.

10          **Q**     Would it have been more money on an hourly

11     basis than you were making at Nabors?

12          **A**     I'm not for sure.

13          **Q**     Was it in that range?

14          **A**     Most likely would have been, yes.

15          **Q**     As I understand it, then, you went to work

16     at Pioneer Drilling after you left -- after your

17     employment involuntarily ended at Patterson; is that

18     true?

19          **A**     I believe that's right.

20          **Q**     All right.  And I think you told me that

21     you worked at Pioneer for two months?

22          **A**     Somewhere right around there, roughly.

23          **Q**     Around that time frame.  Okay.

24          And all of these jobs that we're talking

25     about -- at least up to this point, these are all

**Bradley A. Schlottman**
**5/25/2010**

1      working on a drilling rig?

2           **A**     They were, yes.

3           **Q**     Right.  I mean, working on a -- as a floor

4      hand or a motor hand or doing something where you're

5      actually involved in the drilling for natural gas or

6      oil?

7           **A**     That's correct.

8           **Q**     And why did your employment end at Nabors?

9           **A**     At Nabors?

10          **Q**     I'm sorry.  At Pioneer.  I'm sorry.

11          **A**     At Pioneer?

12          **Q**     Yes.

13          **A**     Because we showed up, and we were told our

14     services were no longer needed, we could go to the

15     house.

16          **Q**     So were you -- is it your testimony that

17     you were terminated voluntarily or involuntarily?

18          **A**     Involuntarily.

19          **Q**     All right.  Do you have a recollection of

20     your brother being terminated and you quitting?

21          **A**     I do not have a recollection of that, no.

22          **Q**     All right.  Is it your recollection that

23     somebody told you that your employment was

24     terminated?

25          **A**     It is, yes.

Bradley A. Schlottman
5/25/2010

1      identified three employers, Patterson, Cactus, and

2      Nabors.  Do you see that?

3          **A**     I do.

4          **Q**     And those were not your last three

5      employers, were they?

6          **A**     No, they were not.

7          **Q**     So that's a lie.  Correct?

8          **A**     That is correct.

9          **Q**     And then here you -- you say that you

10     worked derricks for Patterson and for Cactus.  Do

11     you see that?

12         **A**     I do see that.

13         **Q**     That wasn't true, was it?

14         **A**     No.  That's true.

15         **Q**     Oh, you were a derrick man for Patterson

16     and for Cactus?

17         **A**     I performed that work, yes.

18         **Q**     So your testimony is that you performed

19     work on derricks at Patterson and Cactus?

20         **A**     It is.

21         **Q**     Okay.  And then here at Patterson, it says

22     that your employment dates were from 1/08 to -- oh,

23     I'm sorry -- 1 October, '08, to 10 November, '08.

24     Do you see that?

25         **A**     I see that.

**Bradley A. Schlottman**
**5/25/2010**

1          **Q**     That's not even close, is it?

2          **A**     No, it is not.

3          **Q**     And then the next one says Nabors -- that

4     you worked motors at Nabors.  Did you work motors at

5     Nabors?

6          **A**     I did.

7          **Q**     All right.  And then you worked from 3

8     October, '06 to February 15, '08, that you worked

9     there for a year and a half?

10         **A**     I would assume that would be a little over

11    a year and a half, yeah.

12         **Q**     That's a big lie, isn't it?

13         **A**     Yes, it is.

14         **Q**     Huh?

15         **A**     Yes.

16         **Q**     Look at the -- do you see the second page

17    where you signed it at the bottom, where it says,

18    "Acceptance of terms and conditions"?

19         **A**     I see that.

20         **Q**     And do you see there's a date -- you dated

21    that document, didn't you?

22         **A**     I believe so.

23         **Q**     Right above that on Paragraph 6, it says,

24    "You warrant that all information contained in this

25    application, or otherwise provided by you to Pioneer

**Bradley A. Schlottman**
**5/25/2010**

 1         **Q**     All right.  Did you -- did you have
 2     anything to do with your brother Joseph getting
 3     hired at Unit?
 4         **A**     I did.
 5         **Q**     And how did you help him get hired?
 6         **A**     Me and my brother spoke with the -- sorry.
 7     Me and Jon Schlottman talked with the superintendent
 8     about attempting to get another man since we were
 9     changing over from water-based mud to oil-based mud.
10         **Q**     And do you know when you had that
11     conversation with -- with the -- did you say the
12     drilling superintendent?
13         **A**     I did.
14         **Q**     And is this the drilling superintendent
15     that you couldn't identify earlier?
16         **A**     It is.
17         **Q**     The person that you think may have been
18     named Bill?
19         **A**     No.  It is a different superintendent.
20         **Q**     Is it the person that you -- that was in
21     Oklahoma?
22         **A**     It is.
23         **Q**     All right.  And did you -- I thought you
24     told me you talked to him on one occasion, and that
25     was when you were in Antlers.

Bradley A. Schlottman
5/25/2010

1       **A**    Vaguely, yes.

2       **Q**    So you do recall others?

3       **A**    Yes.

4       **Q**    All right.  And how many other occasions

5    do you specifically recall, as we sit here today?

6       **A**    As I said just a minute ago, I can think

7    of at least two for sure.

8       **Q**    All right.  And were these instances where

9    he asked you if you wanted to touch his penis -- did

10   those occur before or after your -- your little

11   brother Joseph came to work at Unit?

12      **A**    Before.

13      **Q**    And the -- I think you told me that you

14   saw him -- that the -- well, you told me that he

15   stuck his -- you recall him specifically sticking

16   his finger down your pants on two occasions?

17      **A**    That's correct.

18      **Q**    Can you give me any details about that?

19      **A**    The first time he did it, I was out on the

20   rig floor.  I think I was pulling slips at the time.

21      **Q**    Was there anybody else present?

22      **A**    There was.

23      **Q**    Who was present?

24      **A**    Randall Moore, Jonathan Moore, and Carl

25   Powell.

Bradley A. Schlottman
5/25/2010

1      **A**    He has not.

2      **Q**    After you told him, don't touch -- don't

3   put your finger down my pants, did he stop?

4      **A**    For that day he did, yes.

5      **Q**    Is that -- was that the end of it?  Did

6   you ever have any other episodes where he stuck his

7   finger down your pants or tried to?

8      **A**    I did.

9      **Q**    How many occasions?

10     **A**    At least one more that I can remember.

11     **Q**    All right.  And when was that in

12  relationship to the first situation?

13     **A**    I'd say approximately within two weeks.

14     **Q**    All right.  And were these events before

15  or after your brother Joseph began to work at Unit?

16     **A**    Before.

17     **Q**    And then the -- and are those the two

18  occasions that you recall?

19     **A**    They are.

20     **Q**    All right.  And the second time that he

21  began to stick his finger down your crack, did --

22  did you stop him again?

23     **A**    I did.

24     **Q**    All right.  And did you say something to

25  him?

**Bradley A. Schlottman**
**5/25/2010**

1      and who made that phone call?

2            **A**      Jonathan Schlottman did.

3            **Q**      Was there anybody else present besides you

4      and Jonathan?

5            **A**      Our younger brother, Joseph.

6            **Q**      And where were you located when that

7      occurred?

8            **A**      We were in Antlers.

9            **Q**      And where did you call?

10           **A**      What do you mean?

11           **Q**      Where were you calling from?

12           **A**      From a pay phone.

13           **Q**      And is there a particular reason why you

14     called a pay phone -- from a pay phone?

15           **A**      From a pay phone?

16           **Q**      Yeah.

17           **A**      Because we didn't want it traced back to

18     us.

19           **Q**      All right.  And why didn't you want it

20     traced back to you if you were the ones making the

21     complaint?

22           **A**      Because we didn't want to jeopardize

23     retaliation.

24           **Q**      You had been trained, hadn't you, that the

25     company wouldn't tolerate retaliation?

Bradley A. Schlottman
5/25/2010

1       **A**    That's what we had been told, but we

2    were -- I'm sorry.  I'm trying to add to.

3       **Q**    Is that true?  You had been trained by the

4    company that it wouldn't tolerate harassment or

5    discrimination in the workplace?

6       **A**    We had been told that, yes.

7       **Q**    And you had also been told that the

8    company wouldn't allow retaliation against anybody

9    if they reported a complaint, correct?

10       **A**    Again, we had been told that, yes.

11       **Q**    All right.  And you had also been alerted

12    to the company's policy against discrimination and

13    harassment, hadn't you, when you received your

14    orientation in Texas?

15       **A**    I can't say for sure whether or not -- I'm

16    sure I signed something on it.

17       **Q**    Did you -- do you recall watching a video

18    at the -- at the Weatherford office about harassment

19    and discrimination in the workplace?

20       **A**    I recall the lady that did our paperwork

21    turned on a video and said, don't worry about this,

22    just let it play, fill out your paperwork.  What was

23    played on the videos, I can't tell you.

24       **Q**    You didn't watch it?

25       **A**    No, we did not.

Bradley A. Schlottman
5/25/2010

1        **A**    I was on some of them.

2        **Q**    And you passed that -- those physicals?

3        **A**    I did.

4        **Q**    Anything else that you physically or

5     mentally can't do work-wise since you left the

6     military?

7        **A**    Other than that, not that I can think of

8     off the top of my head.

9        **Q**    And did you have a chance to think any

10    further about what you would like in terms of

11    restitution?

12       **A**    I have not given it any further thought.

13       **Q**    All right.  Oh, you were going to tell me

14    about Mr. Powell.  I asked you if you had made a

15    complaint against Mr. Powell or you were alleging

16    some inappropriate behavior toward -- by Mr. Powell.

17       **A**    That is correct.

18       **Q**    And could you tell me what Mr. Powell did

19    that you are now suing him for or suing the company

20    for?

21       **A**    For his comments as far as referring to us

22    as being members of the Aryan Brotherhood, for his

23    religious jokes against our specific religion, for

24    his general hostility, using his size to bully us.

25    I believe the terminology that was used on the

**Bradley A. Schlottman**
**5/25/2010**

1     filing was hostile work environment, something along

2     those lines.

3        **Q**     All right. And do you think he created

4     this -- what you refer to as a hostile work

5     environment because of -- because of his race?

6        **A**     I can't speculate as to why he decided to

7     create it.

8        **Q**     Or because of your gender?

9        **A**     Again, I can't speculate as to why he

10     opted to do what he did.

11        **Q**     Or because of your religious beliefs?

12        **A**     Again, I can't speculate as to why he

13     chose to do what he did.

14        **Q**     Do you have any evidence that the reasons

15     that he did whatever he did in the workplace was

16     because of your race?

17        **A**     As was stated earlier in the conversation,

18     I sat through my brother's deposition. And in an

19     effort to alleviate an argument such as that, the

20     evidence I have towards it would be not only my

21     accounts of it but the accounts of the other

22     individuals that my lawyer has obtained for that

23     purpose.

24        **Q**     Do you know what evidence your lawyer has

25     obtained?

**Bradley A. Schlottman**
**5/25/2010**

1      **A**    I am unaware as to what she has obtained

2      for me.

3      **Q**    All right.  Did you indicate that he

4      referred to you as a part of the Aryan Brotherhood?

5      Did he refer to you specifically?

6      **A**    Yes, he did.

7      **Q**    All right.  And on how many occasions did

8      he refer to you as being a member of the Aryan

9      Brotherhood?

10     **A**    I can think of at least two.

11     **Q**    All right.  And what were the

12     circumstances surrounding these, quote, statements?

13     **A**    One of them was an altercation between him

14     and Jonathan Moore.

15     **Q**    All right.  And when was this altercation?

16     **A**    I believe it was while we were rigging up

17     on the site there in Antlers.

18     **Q**    It was actually the last hitch before you

19     left, wasn't it?

20     **A**    No.  It wasn't -- it wasn't the last hitch

21     before I left.

22     **Q**    All right.

23     **A**    I'm pretty sure it would have been, like I

24     said, the -- probably -- approximately three hitches

25     before I left.

Bradley A. Schlottman
5/25/2010

1      **Q**    And what did he say?  What did Mr. Powell

2    say to you?

3      **A**    He didn't specifically state it to me.

4    The comment was made about me in my presence.

5      **Q**    All right.  What was he -- what did he say

6    about you in your presence?

7      **A**    He made a comment about the fact that him

8    and a group of individuals could take care of

9    people -- what was the wording he used on it?  The

10   general consensus of it was that he had a group of

11   individuals that could take care of white

12   individuals such as the Moores and me and my

13   brother.  As to the exact terminology used, I can't

14   testify to the exact wording of that altercation.

15     **Q**    Was that all he said?  Him and a group of

16   individuals could take care of people such as the

17   Moores and you and your brother?

18     **A**    Well, as I said -- you even -- you

19   abbreviated it even shorter than I did, the

20   conversation.

21            The comment was made that he could take

22   care of individuals, referring to me and my brother

23   and the Moores' race type people, and that was the

24   part that you had left out on that last question.

25     **Q**    Well, you didn't say that.

Bradley A. Schlottman
5/25/2010

1     **Q**   Or a darkie?

2     **A**   Again, I don't believe I've ever heard

3 anybody use those terminologies.

4     **Q**   All right. Have you ever -- if Mr. -- if

5 Mr. -- if either of the Moores used those terms, do

6 you believe that Mr. -- do you believe that

7 Mr. Powell has the right to sue them for

8 racial-based discrimination?

9         MS. GOWENS:  Object to the form.

10        THE WITNESS:  I suppose, yeah.

11    **Q**   (BY MR. TURNER)  Any other -- you said you

12 heard him once say that a group of -- a group of

13 people of your race, that he could -- and you know

14 some people who could take care of -- could take

15 care of people such as you and your brother.

16     Anything else that you heard him say that

17 you thought was offensive or degrading based on your

18 race?

19    **A**   I know at one point in time he had accused

20 me directly of being -- I can't remember if he said

21 a clan leader or a grand wizard or -- some kind of

22 leader of the Ku Klux Klan.

23    **Q**   And when did he say that?

24    **A**   Oh, that would have been probably within

25 the first -- probably sometime in the second month

Bradley A. Schlottman
5/25/2010

1     that I was working with him.

2        **Q**   So that would have been -- that would have

3     been well before your little brother Joseph began to

4     work at Unit?

5        **A**   Yes.  That would be considerably before,

6     yes.

7        **Q**   And would this -- this issue about the

8     discussion that -- or the argument that Jonathan

9     Moore and Carl Powell had that was about -- what you

10    say was about three hitches before the end of your

11    employment, would that have been before or after

12    your little brother Joseph began to work at Unit?

13       **A**   I can't remember.  It would have been

14    either right before or right after, because it was

15    in the same week that Joe got hired.

16       **Q**   All right.  And what were the context of

17    this comment that he allegedly made about you being

18    a clan leader or a grand wizard?

19       **A**   I can't remember exactly what brought it

20    up.  I don't know if it was him and the Moores

21    talking in the doghouse and I just walked into it

22    and -- they were trying to razz me about the fact

23    that I always wore cowboy attire and everything

24    else, and he surmised that I was a -- a member of

25    the Aryan Brotherhood.  Or if it was because of my

**Bradley A. Schlottman**
**5/25/2010**

1    haircut or what.  I can't remember.  There was

2    something -- something to do with something about me

3    that brought it up as to my appearance, but I really

4    don't recall the exacts on it.

5         Q    I'm just trying to understand what he said

6    specifically about you being a clan leader or the

7    grand wizard.

8         A    Correct.  That's -- that's what -- due to

9    something about the way I was looking or something

10   led him to believe I was a member of the Ku Klux

11   Klan and that he would guess that I was probably a

12   clan leader or the grand wizard or something along

13   those lines, something -- something referring to a

14   leadership in the Ku Klux Klan.

15        Q    Was he serious?

16        A    Yes, he was.

17        Q    He was -- he thought -- he really

18   thought --

19        A    Yes.  He was --

20        Q    -- you were a member of the KKK?

21        A    -- dead serious about it.

22        Q    All right.  Dead serious?

23        A    Okay.  Maybe I used that term a little too

24   literally.  He was very serious about it.

25        Q    Did you report that to anybody?

**Bradley A. Schlottman**
**5/25/2010**

1     **A**     I may have talked to Shane about it, but I

2     don't -- I don't remember if I actually talked to

3     Shane about it or not.  I know I spoke with the

4     Moores about it.

5          **Q**     Did you report it to anybody else?

6          **A**     About that specific incident?

7          **Q**     Yes.

8          **A**     Not that I can recall today.

9          **Q**     All right.  Did you report the issue about

10    this altercation between -- between Jonathan Moore

11    and -- and Carl Powell?

12         **A**     I briefly talked with Shane about it to

13    make sure that what Randall had told me happened

14    really did.

15         **Q**     Did Shane -- was Shane there when it

16    happened?

17         **A**     He was not on the floor, no.

18         **Q**     All right.  Well, what did you tell Shane?

19         **A**     I asked Shane if Randall had really come

20    down there and told him what Randall had told me he

21    said happened.

22         **Q**     Yeah.  And what did he say?

23         **A**     He said that, yes, Randall had come down

24    there and told him.

25         **Q**     All right.  And what did he say?

Bradley A. Schlottman
5/25/2010

1       **A**     What did who say?

2       **Q**     What did Shane say?

3       **A**     That's what Shane said, is that Randall

4    had come down there and relayed what had happened.

5    I said okay and walked out the door.

6       **Q**     All right.  Anything else?

7       **A**     Not that I can recall.

8       **Q**     All right.  Did you go to anybody else

9    about that issue?

10      **A**     About that specific one, no.

11      **Q**     So you were just trying to find out if

12   Randall had -- if Randall had told Shane what

13   Randall told you he told Shane?

14      **A**     Correct.

15      **Q**     Okay.  You weren't going down there for

16   the purpose of making a complaint, were you?

17      **A**     If Randall hadn't actually told Shane what

18   he had, yes, I would have.

19      **Q**     But you didn't complain, because your

20   understanding was that Randall had already talked to

21   Shane?

22      **A**     That is correct.

23      **Q**     Anybody else that you spoke with about

24   that issue?

25      **A**     Like I said, just the Moores.

Bradley A. Schlottman
5/25/2010

1       **Q**    Right.  Anybody in management?

2       **A**    Not that I'm aware of.  Not me

3   specifically, no.

4       **Q**    Okay.  Any other inappropriate comments or

5   degrading, offensive behavior by Carl Powell?

6       **A**    As to the specifics of it, just -- I'm

7   trying to think of the particular incidence.  Give

8   me a minute to -- there's no other specific

9   incidence, as I sit today, that really just stands

10  out.  That's not to say there isn't something else

11  that happened, but I can't remember it right now.

12      **Q**    Are you alleging that Carl Powell treated

13  you differently because you're white?

14      **A**    I believe he did, yes.

15      **Q**    All right.  Do you have anybody that he --

16  that he worked with that was black that you believed

17  he treated more preferentially or differently?

18      **A**    I do not know anybody that is of that race

19  that worked with him, no.

20      **Q**    So you don't have anybody to compare

21  yourself to who is of a -- who is African-American?

22      **A**    That is African-American, no.

23      **Q**    Everybody that you worked with was

24  Caucasian?

25      **A**    No.

Bradley A. Schlottman
5/25/2010

1   **Q** Everybody that was on your crew was

2 Caucasian?

3   **A** That was on my crew, yes.

4   **Q** Yeah.  And did -- did he treat anybody

5 differently than he treated you?

6   **A** On --

7   **Q** Your crew.

8   **A** My crew or the rig?

9   **Q** On your crew.

10   **A** On my crew?

11   **Q** Yes.

12   **A** Specifically as in regards to --

13   **Q** Race.

14   **A** Race?

15   **Q** Yes.

16   **A** No.  He treated us all pretty well like

17 trash.

18   **Q** All right.  Did he treat you with respect?

19   **A** Touch and go.  Some days he would treat me

20 with more respect than others.

21   **Q** Did he treat you with dignity?

22   **A** Depending on the mood he was in, he did.

23   **Q** Did he ever -- did he ever do anything to

24 terminate your employment or attempt to terminate

25 your employment?

**Bradley A. Schlottman**
**5/25/2010**

1          **A**     If he did, I'm not aware of what it was.

2          **Q**     But he had the power to terminate your

3      employment, right?

4          **A**     I'm not for sure as to what the

5      stipulations with Unit is.  I'm sure he had the

6      recommendation for it.  As to whether he actually

7      had the power to end my employment or not, I

8      couldn't testify.

9          **Q**     Well, he was your boss, wasn't he?

10         **A**     He was the supervisor, yes.

11         **Q**     And he was the one to whom you directly

12     reported, right?

13         **A**     Correct.

14         **Q**     Anything else that Mr. Powell did that you

15     thought was -- that you're complaining about in this

16     lawsuit?

17         **A**     Like I said, off the top of my head right

18     now, those are the only two instances that I can --

19         **Q**     So two occasions of what you thought was

20     improper speech?

21         **A**     As we sit today, yes.  That's all I can --

22         **Q**     Did he ever -- did he ever touch you

23     inappropriately?

24         **A**     No.  I don't believe Carl ever did.

25         **Q**     Did he ever physically damage you in any

Bradley A. Schlottman
5/25/2010

Page 366

1      way?

2          **A**    He used his size to try to get me to cower

3      down to him.

4          **Q**    Did you cower down to him?

5          **A**    I was intimidated by him, yes.

6          **Q**    Well, he's a large guy, right?

7          **A**    Very large.

8          **Q**    Did you ever complain to anybody about

9      that --

10         **A**    Just --

11         **Q**    -- that he -- that you thought he was

12     trying to get you to cower down to him?

13         **A**    Just the Moores.

14         **Q**    All right.  Anybody else?

15         **A**    I may have mentioned something to Shane

16     about it, but I can't recall off the top of my head

17     a specific time where I would have gone in to him to

18     talk to him about it.

19         **Q**    Can you identify anytime where you

20     complained to Mr. Battles that Mr. Moore was trying

21     to intimidate you?

22         **A**    If you're referring to Carl on that one,

23     no.  You said Mr. Moore.

24         **Q**    Oh, I'm sorry.

25             Mr. -- where you went to Mr. Battles and

Bradley A. Schlottman
5/25/2010

Page 367

1      told him that Mr. Powell was trying to intimidate

2      you?

3          **A**     Not that I can recall off the top of my

4      head.

5          **Q**     All right.  Are you alleging that he

6      discriminated against you on the basis of your

7      religious beliefs?

8          **A**     I am.

9          **Q**     And have you asserted a charge of

10     discrimination against him on the basis of your

11     religious beliefs?

12         **A**     I don't recall if it's in the EEOC

13     complaint or not.  I really can't remember.

14         **Q**     What did Mr. Powell do that you thought

15     was discriminatory that -- and, by the way, did

16     these two incidents that happened over this -- the

17     length of your employment, did they affect your

18     workplace?  In other words, were you able to

19     continue to do your job, even though he made

20     these -- you allegedly made these comments?

21         **A**     I was constantly wondering whether he was

22     going to get into a physical altercation with me,

23     things of those natures.

24         **Q**     Uh-huh.

25         **A**     But did I overcome them and still manage

Bradley A. Schlottman
5/25/2010

1    to do my job?  Yes.

2         Q    All right.  Did Mr. Powell -- did you

3    suffer any emotional distress as a result of

4    Mr. Powell's treatment of you?

5         A    I felt as though I was being bullied by

6    him.

7         Q    Did he ever touch you?

8         A    Again, like I said before, I don't recall

9    a time where he ever actually physically laid hands

10   on me, no.

11        Q    All right.  Did he ever threaten you?

12        A    Other than the instance where he was

13   referring to his entire crew during the altercation

14   between Jonathan and himself, I don't -- I don't

15   recall one that just really stands out in my mind

16   right now.  But, again, there's nothing to say that,

17   given his testimony or someone else's, I wouldn't

18   remember an instance.

19        Q    I'm just asking if you have any

20   recollection of any threats that he made to you or

21   against you.

22        A    Not off the top of my head.  No, I do not.

23        Q    And what -- what -- what did he do that

24   you thought was discriminatory towards you about

25   your religious beliefs?

**Bradley A. Schlottman**
**5/25/2010**

1     **A**    To the best of my knowledge, as we sit

2    here today, that -- that was all of it.

3     **Q**    Is there anything --

4     **A**    We discussed the --

5     **Q**    I'm sorry.  Is there anything you want the

6    company to do about what you consider to be

7    religious -- or consider to be racial

8    discrimination?

9     **A**    Yes.  I believe that along with the sexual

10   harassment and everything else, there is not an

11   appropriate communication between the higher-ups and

12   the -- the roughnecks on the rig to say, hey, look,

13   if you file, we will do something about this.

14    **Q**    Did you ever report to anybody your -- you

15   told me you -- right -- you never reported to

16   anybody any of the racial issues, right?

17    **A**    I think I said that I may have talked to

18   Shane about it, but I can't remember.

19    **Q**    Right.  But you can't testify, as we sit

20   here today, that you talked to any member of

21   management, can you?

22    **A**    As I said, I can't recall whether I did or

23   did not talk with Shane.

24    **Q**    All right.  And so -- okay.  And did you

25   ever -- did you ever complain to anybody in

Bradley A. Schlottman
5/25/2010

1    this document?

2         **A**    To my knowledge, no.

3         **Q**    All right.  Here's what you wrote.  "Tool

4    pusher chasing hands with pant around ankle with

5    penis in hand."  Is that what you wrote?

6         **A**    That's what it says, yes.

7         **Q**    All right.  And the second sentence is,

8    "tool pusher putting" -- is that putting?

9         **A**    I believe it is, yes.

10        **Q**    Does putting have two Ts or one?

11        **A**    I'm not an English teacher.  I couldn't

12   tell you for sure.

13        **Q**    All right.  "Putting finger down pants and

14   in butt crack" -- is that supposed to be

15   "et cetera"?

16        **A**    I believe that's what I was intending by

17   it, yes.

18        **Q**    And what is meant by the words

19   "et cetera"?

20        **A**    And other things, I believe is what

21   "et cetera" stands for.

22        **Q**    All right.  And then you said, "Driller

23   telling hand he would beat them up and they could

24   just call all three Aryan Brotherhood buddy"?

25        **A**    I believe that's "all their Aryan

Bradley A. Schlottman
5/25/2010

1    Brotherhood buddy."

2         Q    "All their" -- oh, their.  I got you.

3         A    Yes.  It should have had an apostrophe, I

4    believe is what the grammatical -- well, maybe not.

5    I don't know.  I'm not extremely good with writing,

6    as you can tell by my handwriting.

7         Q    All right.  But those are the words you

8    wrote to the EEOC, correct, when you filled out this

9    questionnaire?

10        A    That is correct.

11        Q    And were these things true when you wrote

12   them?

13        A    I believe they were, yes.

14        Q    Now, you said here, "Driller telling hand

15   he would beat them up."  Who did -- who did -- I

16   assume you're referring to Carl Powell?

17        A    I am.

18        Q    "Telling hand" -- who is the hand?

19        A    The hand would be Jonathan Moore.

20        Q    Okay.  Telling Jonathan Moore he would

21   beat them up and they could just call their Aryan

22   Brotherhood buddy; is that right?

23        A    That's what it says, yes.

24        Q    Okay.  And that's what you're referring to

25   there?

**Bradley A. Schlottman**
**5/25/2010**

1        **A**      Yes, that is what I'm referring to there.

2        **Q**      And that's the entirety of the allegations

3     that you make in the questionnaire; is that true?

4        **A**      That's all that is on the questionnaire,

5     yes.

6        **Q**      Okay.  And that was written during -- at

7     least while you were still employed at Unit,

8     correct?

9        **A**      That is correct.

10       **Q**      And you've already previously testified

11    that your memory was better then than it is today;

12    is that true?

13       **A**      I believe I testified to something along

14    those lines, yes.

15       **Q**      Let me hand you what's been marked as

16    Exhibit No. 39 to this proceeding and ask if you can

17    identify this document for me, please.

18       **A**      I believe this documentation is EEOC

19    Form 5.

20       **Q**      All right.  And do you know what that is?

21       **A**      It says Charge of Discrimination at the

22    top.

23       **Q**      Okay.  And I notice that there's a

24    signature on the bottom left-hand corner.  Do you

25    recognize that signature?

**Bradley A. Schlottman**
**5/25/2010**

1      **A**    I do.

2      **Q**    And right above it, it says, "I declare

3    under penalty of perjury that the above is true and

4    correct."  Do you see that?

5      **A**    I do.

6      **Q**    Do you understand what that term means,

7    "penalty of perjury"?

8      **A**    Vaguely, yes.

9      **Q**    What do you understand it to mean?

10     **A**    I understand it to mean that I can be

11   charged in court and, if found guilty, be sentenced

12   for lying.

13     **Q**    But you wouldn't lie, would you?

14     **A**    Under the right circumstances I would,

15   yes.

16     **Q**    Okay.  Well, you certainly would never lie

17   on a charge of discrimination, would you?

18     **A**    Under penalty of perjury, no, I would not.

19     **Q**    Here you indicate that you're alleging

20   discrimination based on race and sex.  Do you see

21   that?

22     **A**    I do.

23     **Q**    And then to the right of that you say the

24   dates the discrimination took place were 9/21/07 to

25   April 14, '08; is that correct?

Bradley A. Schlottman
5/25/2010

1          **A**     That's what -- it says the earliest would

2     have possibly been -- the earliest possible date

3     would be 9/21/2007 and the latest possible date

4     would have been 4/14/2008, yes.

5          **Q**     Right.  And you signed this document as

6     that being true?

7          **A**     I did.

8          **Q**     Okay.  Then you indicate here, "I have

9     worked for Unit Drilling for approximately six

10    months.  I have been subjected to numerous incidents

11    which constitute racial harassment by my supervisor,

12    Carl Powell, black male, and have been sexually

13    harassed by Shane Battles, white male."  Was that

14    true?

15         **A**     That's what's on here, yes.

16         **Q**     All right.  Was that true at the time you

17    signed this under penalty of perjury?

18         **A**     It was, yes.

19         **Q**     "Such racial harassment consists of

20    referring to me as a member of the Aryan

21    Brotherhood"?

22         **A**     If that's how you spell Aryan.  But, yes,

23    that's what it says.

24         **Q**     Did Mr. Powell refer to you as a member of

25    the Aryan Brotherhood?

**Bradley A. Schlottman**
**5/25/2010**

1          **A**    I believe that's what the Ku Klux Klan is,

2     is Aryan Brotherhood, is it not?

3          **Q**    And then, "and threats of bodily harm."

4     Did he ever threaten you?  You told me earlier he

5     never threatened you physically.

6          **A**    No.  I don't believe I ever said he never

7     threatened me.  Actually, I believe I -- I believe

8     it is my testimony that he did threaten me

9     through -- what was the term -- what was the exact I

10    used -- using his size advantage over me to threaten

11    me, I believe was my testimony earlier.

12         **Q**    No.  This says, "threats of bodily harm."

13    That's what it says.

14         **A**    Right.

15         **Q**    So that means threats of hurting you.  And

16    you told me earlier under oath that he never

17    threatened to hurt you.

18         **A**    I don't believe I ever testified to that.

19    I believe I testified --

20         **Q**    Well, the record will be very clear about

21    that, Mr. Schlottman.

22         **A**    Shall we recall the record, then?

23         **Q**    We don't need to.  We'll just do that in

24    court.

25         **A**    Okay.

1      **Q**     Is it your testimony today that he made a

2      threat of bodily harm against you, that he

3      threatened to hurt you?

4      **A**     It is my belief, yes.

5      **Q**     No.  No.  He made a threat.  What threat

6      did he make to you that he was going to hurt you?

7      **A**     His towering over me and trying to make me

8      cower down to him is a threat.

9      **Q**     Did he ever tell you he was going to do

10     bodily harm to you?

11     **A**     Did he verbally threaten me?

12     **Q**     Yes.

13     **A**     I can't recall if he ever did.

14     **Q**     Do you have any -- can you testify about

15     any single incident today where Mr. Battles -- I

16     mean, Mr. Powell made a threat of bodily harm to

17     you?

18     **A**     Actually, yes.  I believe I testified to

19     it earlier, as memory recalls.  I believe I

20     testified as to the altercation between him and

21     Jonathan.  The verbal threat he even made during

22     that was to our entire crew on it, as to he had --

23     him and the group -- I don't remember the exact

24     group he was referring to -- could take care of all

25     of us, implicating a verbal threat to me that he

**Bradley A. Schlottman**
**5/25/2010**

1     would do bodily harm to both -- to all of us.

2          **Q**    All right.  So that's what you're talking

3     about when you say "threats of bodily harm"?

4          **A**    That, and like I stated earlier, as far as

5     bullying me with his size and other things, yes.

6          **Q**    You say the sexual -- and are those the

7     only two things that you identified here as being,

8     quote, racial harassment, right?

9          **A**    That's all that is written on here, yes.

10          **Q**    Yeah.  It says, "that consists of

11     referring to me as being a member of the Aryan

12     Brotherhood and threats of bodily harm, period."

13     Right?

14          **A**    That's what it says, yes.

15          **Q**    Then it says, "The sexual harassment" --

16     and these are -- this is your charge, right?  This

17     is the document you filed under penalty of perjury

18     with the EEOC, correct?

19          **A**    Again, I'm not sure as to the terminology

20     of "I filed."  I signed the paperwork, yes.

21          **Q**    Yeah.  This is your -- your statement to

22     the EEOC that you were wanting to assert a complaint

23     against Unit Drilling Company, correct?

24          **A**    That it is, yes.

25          **Q**    This says, "The sexual harassment consists

Bradley A. Schlottman
5/25/2010

1      of being subjected to physical touching of my butt

2      and having Mr. Battles drop his pants and expose his

3      penis, period."  Did I read that correctly?

4          **A**     You did.

5          **Q**     "I personally have complained of the

6      racist comments and am aware that others have

7      complained of the sexual harassment."

8          **A**     That's correct.

9          **Q**     So you don't even say in this document

10     that you complained about sexual harassment, do you?

11         **A**     I don't see anywhere where it is stated in

12     there, no.

13         **Q**     Right.  And you say here you personally

14     complained about the racist comments, but you told

15     me you had no recollection of making any such

16     complaints.

17         **A**     And as I sit here today, I still cannot

18     remember any exact detail of it.

19         **Q**     Then you say, since these -- "Since these

20     complaints, the respondent has taken no action, nor

21     has the behavior stopped."

22         **A**     That's what it says, yes.

23         **Q**     Well, Mr. Powell had not engaged in any

24     racial harassment of you, had he, in several --

25     several hitches, according to your testimony

Bradley A. Schlottman
5/25/2010

1    earlier?

2        **A**    No.   That --

3        **Q**    Wasn't the last time he made a comment

4    was, like, three hitches before the end of

5    employment, where you said he made this Aryan

6    Brotherhood comment?

7        **A**    I don't believe I ever stated that was the

8    last comment.

9        **Q**    Can you testify about any more recent

10   comment than that comment?

11       **A**    Can I give a definitive example of one

12   during that time frame, off the top of my head

13   today, as we sit?

14       **Q**    Can you identify one incident after that

15   event where you are alleging that Mr. Powell engaged

16   in racial harassment?

17       **A**    I can't recall any, as I sit here today,

18   no.

19       **Q**    Well, you certainly weren't the victim of

20   any racial harassment on the 14th day of April, were

21   you?

22       **A**    I'm not for sure if there was any comment

23   made that -- I can't remember if there was a comment

24   made that day or not.

25       **Q**    Well, certainly you would have remembered

**Bradley A. Schlottman**
**5/25/2010**

1   break.  If you'll give me two minutes, that will --

2   let's go off the record, take a break, and I will go

3   through my notes.  And you guys can sit right here.

4   You don't have to leave.

5            THE VIDEOGRAPHER:  We are off the record.

6            (A break was taken from 6:27 p.m. to

7   6:30 p.m.)

8            THE VIDEOGRAPHER:  We're on the record.

9       Q    (BY MR. TURNER)  Mr. Schlottman, have

10  you -- prior to going to work for Unit -- were you

11  terminated by any other employer before you went to

12  work for Unit --

13      A    I was.

14      Q    -- involuntarily?

15      A    Oh, involuntarily?

16      Q    Yes.

17      A    Yes, I was.

18      Q    Who were you terminated by?

19      A    Red Lobster's.

20      Q    Anybody else?

21      A    No.  I think Red Lobster's was it.

22      Q    All right.  Did you -- is it my

23  understanding of the racial comments that Mr. Powell

24  allegedly made, that it was really the two comments

25  that you've told about today; is that right, in

**Bradley A. Schlottman**
**5/25/2010**

1    terms of him making -- talking about an Aryan

2    Brotherhood situation, or whatever that comment was,

3    and then the other comment about you being in the

4    KKK?

5        **A**    Those are the two that I can remember

6    today, yes.

7        **Q**    And do you have any notes or anything that

8    would refresh your memory?

9        **A**    I have no notes.  As far as anything that

10   would refresh my memory, I am not for sure what --

11       **Q**    I'm just asking if you have --

12       **A**    -- statements I may hear, you know, what

13   other accounts that someone else may tell me about

14   that may spark a memory up.

15            I mean, certainly, you would agree that if

16   I was to sit through someone's statement about a

17   detailed account that involved me, it would spark

18   something.  So I cannot say that there is nothing

19   out there that won't spark me to remember, but as I

20   sit today, that is the best of my memory, yes.

21       **Q**    And, again, certainly, your memory was

22   better when you filed the charge and you filed

23   the -- and you prepared the intake questionnaire

24   would have been the best memory of the events that

25   took place, because that was the closest in time to